**In re Linda L. SOMERO, Roy W. Somero, Debtors.**

**Bankruptcy No. 90–20211.**

United States Bankruptcy Court, D. Maine.

Jan. 7, 1991.

Daniel Amory, Gene Maguire, Portland, Me., for movant.

George Marcus, Rick E. Lawrence, Portland, Me., for respondents.

## MEMORANDUM OF DECISION

JAMES A. GOODMAN, Bankruptcy Judge.

Before the Court is the motion of Maine Savings Bank ("MSB" or "the Bank") to prohibit the use of cash collateral.[1] The Bank claims that certain post-petition rents from the Debtors properties are its cash collateral for which it is entitled to adequate protection.

## FACTS

The facts are not seriously disputed. The relationship between the parties began on December 9, 1987 when the Bank, Debtors, and a real estate investment group,

G.A.R. Properties, executed an "Assumption and Amendment of Note and Mortgage" agreement by which Debtors assumed, in modified form, a $3,850,000.00 promissory note and a mortgage from G.A.R.[2] Also on December 9, 1987 the Bank advanced Debtors additional working capital evidenced by a second promissory note, this one for $800,000.00, secured by the aforementioned amended mortgage pursuant to the "Assumption and Amendment of Note and Mortgage" agreement.

The collateral for the G.A.R. Loans consists of twelve residential apartment buildings and two sets of commercial rental properties located in Portland, Maine and South Portland, Maine. There is no dispute that the original mortgage, and the amendment, were duly recorded in the Cumberland County Registry of Deeds. Nor is it disputed that Debtors executed and delivered to the Bank a UCC-1 financing statement which was filed with the Maine Secretary of State's Office on December 16, 1987. Debtors apparently do not dispute that the Bank has a valid, properly perfected mortgage in the real property but deny that that perfection and enforceability applies to post-filing rents and profits.

Pursuant to an agreement of September 30, 1988, Debtors assumed a $365,000.00 promissory note made between James G. McCann and the Bank, along with a "Mortgage and Security Agreement." Debtors also assumed an entirely separate document entitled "Collateral Assignment of Leases and Rents" dated April 13, 1987 and duly recorded in the Cumberland County Registry of Deeds, Book 7713, Page 155. On April 20, 1989 and September 30, 1989 Debtors borrowed, under two new promissory notes, an additional $80,000.00 from the Bank. These two notes, one for $20,-000.00 and one for $60,000.00, were also secured by the McCann mortgage. The

---

1. More precisely the Bank has filed a "Motion to Prohibit Use of Cash Collateral or for Adequate Protection and Relief from the Automatic Stay." This motion was filed simultaneously with a motion for a temporary restraining order and a complaint for injunctive relief. All these pleadings are interrelated and are considered by the Court in its discussion of the cash collateral motion.

2. This set of loans and the properties they relate to will be referred to respectively as the "G.A.R. Loans" and "G.A.R. Properties." A second set of loans and properties involving the Bank and Debtors, to be detailed below, will be referred to as the "McCann Properties" and "McCann Loans."

collateral for this second group of loans, the set relating to the McCann properties, consists of two residential properties, containing a total of twelve apartments. There is no dispute that the original mortgage granted here, and the collateral assignment of leases and rents that was given with the mortgage, and the agreement between the parties by which Debtors assumed both of these were duly recorded in the registry of deeds. Nor is it disputed that a UCC–1 financing statement covering the mortgage and the collateral assignment were recorded in the Secretary of State's Office. Again, Debtors apparently do not dispute that the Bank has a valid, properly perfected mortgage in the real property but they do dispute that the perfection and enforceability applies to post-filing rents and profits.

The mortgages for both the G.A.R. and McCann Properties contain clauses which assign rents and profits to the mortgagee as further security for the loans. The mortgage for the G.A.R. Properties provides the following:

As further security for payment of the indebtedness and performance of the obligations, covenants and agreements secured hereby, Grantor hereby transfers, sets over and assigns to Grantee:

All rents, profits, revenues, royalties, bonuses, rights and benefits under any and all leases or tenancies now existing or hereafter created of the Premises or any part thereof, and all rights against any guarantors of any leases with the right to receive and apply the same to said indebtedness, and Grantee may demand, sue for and recover such payments, but shall not be required to do so; provided, however, that so long as Grantor is not in default hereunder, the right to receive and retain such rents, issues and profits is reserved to Grantor. To carry out the foregoing, Grantor agrees (1) to execute and deliver to Grantee such conditional assignments of leases and rents applicable to the mortgaged premises as the Grantee may from time to time request, while this mortgage and the debt secured hereby are outstanding, and further (2) not to cancel, accept a surrender of, re-

duce the rentals order, anticipate any rentals under, or modify letting thereof, in whole or in part, without Grantee's written consent. Nothing herein shall obligate the Grantee to perform the duties of the Grantor as landlord or lessor under any such leases or tenancies, which duties Grantor hereby covenants and agrees to well and punctually perform.

It further provides:

If default be made in payment, when due, of any indebtedness secured hereby, or in performance of any of Grantor's obligations, covenants or agreements, hereunder, or in said note and such default is not remedied within any applicable grace period:

a. Grantee is authorized at any time, without notice, in its sole discretion, to enter upon and take possession of the Premises or any part thereof, and to perform any acts Grantee deems necessary or proper to conserve the security, and to collect and receive all rents, issues and profits thereof, including those past due as well as those accruing thereafter, and

b. Grantee shall be entitled to have a receiver appointed to enter and take possession of the Premises, collect the rents and profits therefrom and apply the same as the court may direct.

In either such case, Grantee or the receiver may also take possession of, and for these purposes use, any and all personal property contained in the Premises and used by Grantor in the rental or leasing thereof or any part thereof. The expense (including receiver's fees, counsel fees, costs and agent's compensation) incurred pursuant to the powers herein contained shall be secured hereby. Grantee shall (after payment of all costs and expenses incurred) apply such rents, issues and profits received by it on the indebtedness secured hereby in such order as Grantee determines; and Grantor agrees that exercise of such rights and disposition of such funds shall not constitute a waiver of any foreclosure once commenced nor preclude the later com-

mencement of foreclosure for breach hereof. The right to enter and take possession of said property, to manage and operate the same, and to collect the rents, issues and profits thereof, whether by a receiver or otherwise, shall be cumulative to any other right or remedy hereunder or afforded by law, and may be exercised concurrently therewith or independent thereof. Grantee shall be liable to account only for such rents, issues and profits actually received by Grantee.

The McCann Mortgage contains similar language as follows:

As further security for the payment of indebtedness and performance of the obligations, covenants and agreements secured hereby, Grantor hereby transfers, sets over and assigns to Grantee:

a. All rents, profits, revenues, royalties, bonuses, rights and benefits under any and all leases or tenancies now existing or hereafter created of the premises or any part thereof.

The aforementioned "Collateral Assignment of Leases and Rents" relating to the McCann Properties assigns to the Bank a security interest as follows:

All right, title and interest of Assignor in and to, (i) all leases, subleases, licenses, concessions and other occupancy agreements which now or may hereafter affect the Property or any part of parts thereof and all guarantees, modifications, renewals and extensions thereof (the "Leases"), and (ii) all deposits made or hereafter made in respect of the Leases, together with all of the rents, income, revenues, issues, profits, due and to become due or to which Assignor is now or may hereafter become entitled, arising out of the Leases or the Property or any part or parts thereof.

The language in the G.A.R. and McCann Mortgages, as well as the collateral assignment of leases and rents, specifically provide the Bank with an assignment of the rents from the Debtors' properties. While the provisions of the two mortgages and the collateral assignment specifically assign the rents to the Bank, as further security for the loans, Debtors do retain the right to receive the rents as long as they are not in material default on the loans.

There is no dispute that Debtors were in default in late 1989 on all of the above-mentioned notes. On December 7, 1989 the Bank sent a written notice of default and demand letter to the Debtors. On the two G.A.R. notes, with a total original face value of $4,650,000.00, Debtors owed, as of April 15, 1990, $4,979,736.62 together with additional charges, interest and costs of collection. On the McCann notes, with a total original face value of $445,000.00, Debtors owed, as of April 5, 1990, $478,157.74, together with additional charges, interest and costs of collection. Debtors have never cured these defaults and remain in default at this time. The value of the real properties is stipulated to be substantially less than the debt owed the Bank.[3]

Debtors filed their Chapter 11 petition at 2:59 P.M. on April 4, 1990. The Bank learned of the prospective filing the day before, April 3, 1990. The Bank maintains that its actions taken on April 4, 1989 before 2:59 P.M. put it in possession of the commercial properties prior to the filing. The Debtors dispute that the Bank's acts amount to possession. Because the Court's decision does not rest on the issue of possession such evidence is not considered here.

The Bank maintains that it has a properly perfected security interest in the rents and profits, that these rents and profits are cash collateral, and that Debtors should be prohibited from using the same unless the Bank is adequately protected. Debtors contend that the rents and profits are not cash collateral, that the right to rents and profits, as determined by state law, requires first that the Bank either take possession of the properties pre-filing or have a receiver appointed to collect the rents from the properties.

---

**3.** Aside from the liens of MSB the properties are further encumbered by tax liens and junior liens estimated to total over $2,000,000.00.

Since April 27, 1990, pending the outcome of this decision, all post-filing rents from both the commercial and residential properties, less operating expenses, have been deposited in a separate "Net Income Account" held and used by the Debtors.

## DISCUSSION

The case of *Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979) established that the mortgagee's right to rents collected during a mortgagor's bankruptcy was to be determined by the law of the state where the property was located. In this case all of the property in question is located in Maine. Debtors in their brief have argued strenuously that current Maine law clearly establishes that a mortgagee's right to rents and profits first requires that either a receiver be appointed or mortgagee be in possession of the real property from which the rents and profits are derived. The following cases are cited by Debtors for that proposition: *Long v. Wade*, 70 Me. 358 (1879); *Chase v. Palmer*, 25 Me. 341 (1845); *Noyes v. Rich*, 52 Me. 115 (1862); *Emerson v. European and North American Ry. Co.*, 67 Me. 387 (1877); *Carney v. Averill*, 110 Me. 172, 85 A. 494 (1912); *Potter v. Small*, 47 Me. 293 (1859); *Allen v. Bicknell*, 36 Me. 436 (1853); *Anderson v. Robbins*, 82 Me. 422, 19 A. 910 (1890); *Brown v. Leach*, 35 Me. 39 (1852); *Gilman v. Wills*, 66 Me. 273 (1877); *Smith v. Kerr*, 130 Me. 433, 157 A. 314 (1931). This Court has considered these decisions and has determined that they are not dispositive of the issues in this case. Not a single case cited by Debtors involves a mortgage with a specific assignment of rents and profits or a separate collateral assignment.

■ When a mortgagor and mortgagee enter into a mortgage agreement which is silent with respect to any agreement relating to rents and profits, then the entitlement to rents and profits must derive from mortgage foreclosure law. Maine law is clear that the right to rents and profits, where the mortgage instruments are silent, can derive only from those rights that a mortgagee has incidental to foreclosure

upon default. Under these circumstances a mortgagee may be entitled to rents and profits upon a default if it either takes possession of the property or has a receiver appointed to collect the rents and profits. Maine law, however, has never directly addressed the issue of whether a mortgagor and mortgagee may by agreement modify the entitlement to rents and profits without either possession or the appointment of a receiver. One might, in fact, raise the issue as to whether a mortgagor and mortgagee could expressly agree that a mortgagee be entitled to rents and profits without a default having occurred in the terms of the mortgage.

■ This Court is satisfied that Maine law allows the parties to a mortgage agreement to modify entitlement to rents and profits without possession or appointment of a receiver. Two cases from the Maine Supreme Judicial Court support this position and illustrate how the law may be modified by the clear intent of the parties. In *Weeks v. Thomas*, 21 Me. 465 (1843) the mortgagee was in possession of the property by agreement of the mortgagor and paid the mortgagor rent. The Court said:

> A mortgagee in possession cannot be charged for rent by a mortgagor, so long as the premises mortgaged remain unredeemed; *unless there be a special agreement between the parties to the contrary.*

*Id.* at 467. (Emphasis added).

The second case, *Fleet Bank of Maine v. Zimelman*, 575 A.2d 731, 732 (Me.1990) finds that assignment of rent clauses as additional security for mortgage loans are valid, and that if the mortgage loan was "an agreement negotiated at arms length between knowledgeable business persons...." (*Id.* at 734) the courts should not rewrite the agreement but endeavor to "give effect to the plain meaning of the words used." (*Id.* at 734 quoting *City of Augusta v. Quirion*, 436 A.2d 388, 392 (Me.1981)).

■ The Court finds that the Bank's security interest in the rents and profits is an agreement perfected under Maine law by a

recording in the registry of deeds where the mortgage on the real property from which the rents are derived would be recorded. The agreements were properly recorded in the Cumberland County Registry of Deeds.[4] Furthermore, the provisions in the mortgages and the assignments which give the mortgagor the right to use the rents and profits until an event of default does not in any way modify a mortgagee's already perfected security interest.

This Court must now consider whether the properly perfected security interest in the rents and profits continued after the filing of the Chapter 11 proceeding. The plain language of the Bankruptcy Code, Title 11 U.S.C. § 363(a) when read in conjunction with Title 11 § 552(b) indicates that post-petition rents generated by Debtors' properties may be cash collateral, depending on applicable state law. Code § 363(a), which defines cash collateral to include the rents and profits from a property subject to a § 552(b) security interest, provides as follows:

> In this section, "cash collateral" means cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest *and includes the proceeds, products, offspring, rents, or profits of property subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.*

11 U.S.C. § 363(a). (Emphasis added).

Code § 552(b) provides:

> Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, rents, or profits of such property, *then such security interest extends to such proceeds, product, offspring, rents, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law,* except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

11 U.S.C. § 552(b). (Emphasis added).

■ The Bankruptcy Reform Act of 1978, therefore, clearly contemplates that post-petition rents and profits may be cash collateral, and that a pre-filing properly perfected security interest in those rents and profits may survive the filing of the petition.

The legislative history of sections 363 and 552(b) conforms to the plain language of the Code. Both the House and Senate Reports on § 552(b) state the obvious —§ 552(b) provides a creditor-oriented exception to general rule of 552(a) which holds that property acquired post-filing is property of the estate. The House Report on § 552(b) contains the following language:

> As a general rule, if a security agreement is entered into before the case, then property that the estate acquires is not subject to the security interest created by the security agreement. Subsection (b) provides the only exception. If the security agreement extends to proceeds, product, offspring, rents, or profits of property that the debtor had before the commencement of the case, then the proceeds, etc., continue to be subject to the security interest, except to the extent that the estate acquired the proceeds to the prejudice of other creditors holding unsecured claims.

---

**4.** Title 33 M.R.S.A. § 201 provides the Maine law on recording priorities for real property interests. A security interest in real property must be recorded in the registry of deeds in the county where the property is located. As seen above, there is no dispute that the Bank has properly recorded its real property interests in this case. Notwithstanding the fact that the Bank has filed UCC–1 financing statements with the Secretary of State's Office in order to perfect its security interest in the rents and profits, this Court finds that these UCC filings were unnecessary.

*H.R.Rep.* No. 595, 95th Cong. 1st Sess. 376–377 (1977), U.S.Code Cong. & Admin. News 1978, pp. 6332, 6333.

The Senate Report on § 552(b) contains similar language:

> As a general rule, if a security agreement is entered into before the commencement of the case, then property that the estate acquires is not subject to the security interest created by a provision in the security agreement extending the security interest to after-acquired property. Subsection (b) provides an important exception consistent with the Uniform Commercial Code. If the security agreement extends to proceeds, product, offspring, rents or profits of the property in question, then the proceeds would continue to be subject to the security interest pursuant to the terms of the security agreement and provisions of applicable law, except to the extent that where the estate acquires the proceeds at the expense of other creditors holding unsecured claims, the expenditure resulted in an improvement in the position of the secured party.

*S.Rep.* No. 989, 95th Cong. 2nd Sess. 91 (1978), U.S.Code Cong. & Admin.News 1978, p. 5877. *See also* 124 *Cong.Rec.* H11097–8 (daily ed. Sept. 28, 1978); S17414 (daily ed. Oct. 6, 1978) remarks of Rep. Edwards and Sen. DeConcini.

It is clear from the legislative history that § 552(b) is a straight-forward creditors provision designed to provide protection for secured creditors' interests in, for example, debtors' post-filing rents and profits. The House Report goes on to reveal how the Code is to provide additional protections for secured lenders through sections like 363 and 552(b).

> Under present law, there is no similar limit on the debtor's ability to use, sell, or lease soft collateral in the early stages of a reorganization. The protection of the secured creditor is left entirely to the judge. The debtor is usually able to obtain an ex parte order authorizing use, sale, or lease of property quickly, the secured creditor then has an uphill battle to have it overturned. The result has often been a serious erosion in secured creditor's rights, because soft collateral is often easily dissipated or perishable. The provisions governing the right of the trustee or debtor in possession to use, sell, or lease soft collateral also require that the secured creditor's interest be adequately protected. *This is protection that secured creditors do not have today. The bill as written is a significant boon to secured lenders.*

*H.R.Rep.* No. 598, 95th Cong. 1st Sess. 182–183 (1977), U.S.Code Cong. & Admin. News 1978, pp. 6142, 6143. (Emphasis added, footnote omitted.) [5]

Like § 363(a) itself, its legislative history clearly indicates that rents on which the lender has a valid pre-petition lien may be a creditor's cash collateral upon the filing of a bankruptcy petition.

> Subsection (a) defines "cash collateral" as cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents in which the estate and an entity other than the estate have an interest, such as a lien or a co-ownership interest. The definition is not restricted to property of the estate that is cash collateral on the date of the filing of the petition. Thus, if "non-cash" collateral is disposed of and the proceeds come within the definition of "cash collateral" as set forth in this subsection, the proceeds would be cash collateral as long as they remain subject to the original lien on the "non-cash" collateral under section 552(b). *To illustrate, rents received from real property before or after the commencement of*

---

**5.** "Soft collateral", as used herein, is defined to include cash and other collateral which creditors have an interest in, usually through a lien, and which could be easily liquidated and used by the Debtor without the permission of the lienor. The rents on which the Bank has a lien in the case before the Court would be considered "soft collateral." "Soft collateral includes inventory, accounts receivable, cash, general intangibles and other property which may be easily dissipated, in which the estate and an entity other than the estate have an interest. This most frequently includes property subject to a lien." *H.R.Rep.* No. 595, 95th Cong. 1st Sess. 182 (1978), U.S.Code Cong. & Admin.News 1978, p. 6142. (Footnotes omitted).

*the case would be cash collateral to the extent that they are subject to a lien.*

S.Rep. No. 989, 95th Cong. 1st Sess. 55 (1978), U.S.Code Cong. & Admin.News 1978, p. 5841. (Emphasis added).

The Debtors argue that the lien created pre-filing was inchoate unless mortgagee took possession of the properties or had a receiver appointed to collect rents and that since no such action occurred pre-filing that the lien is unenforceable against the Debtors post-filing. Again Debtors misconstrue the intent of the Bankruptcy Code with respect to inchoate liens. Title 11 U.S.C. § 101(33) defines "lien" as a "charge against or interest in property to secure payment of a debt or performance of an obligation." The definition is purposefully broad, and lien is defined, per legislative history, to include "inchoate liens." [6] Even if the Bank's lien was considered "inchoate" the lien would be included within the meaning of lien used in sections 363 and 552 and thus the rents on which it has a lien would be deserving of protection as cash collateral. This Court is satisfied, under the facts of this case, that the Bank had a properly perfected security interest in rents and profits prefiling and its entitlement to those rents and profits, derived pre-filing, continues post-filing within the meaning of § 552(b).

## CONCLUSION

The Court, therefore, finds that the rents and profits at issue in this case, those from both the commercial and residential properties, are the Bank's cash collateral within the meaning of § 363. This conclusion, however, is made without prejudice to Debtors' right to seek approval from this Court for the continued use of that cash collateral.

---

6. In discussing the Code definition of lien, now found at 11 U.S.C. § 101(33), Congress wrote: This definition is new and very broad. A lien is defined as a charge against or interest in property to secure payment of a debt or performance of an obligation. *It includes "inchoate liens."* In general, the concept of a lien is divided into three kinds of liens: judicial liens, security interest, and statutory liens.

The foregoing constitutes the findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052. An appropriate order shall enter.

These three categories are mutually exclusive and are exhaustive, except for certain common-law liens.
H.R.Rpt. No. 595, 95th Cong. 1st Sess. 312 (1977), U.S.Code Cong. & Admin.News 1978, p. 6269; S.Rpt. No. 989, 95th Cong. 2nd Sess. 25 (1978), U.S.Code Cong. & Admin.News 1978, p. 5811. (Emphasis added).