**In re TUCSON INDUSTRIAL PARTNERS, Debtor.**

**SEARS SAVINGS BANK, Appellant,**

v.

**TUCSON INDUSTRIAL PARTNERS, Appellee.**

**BAP No. AZ–88–1728 JVR.**
**Bankruptcy No. 7–01806–TUC–LO.**
**Adv. No. 88–0126.**

United States Bankruptcy Appellate Panel of the Ninth Circuit.

July 17, 1991.

Michael McGrath, Tucson, Ariz., for appellant.

D. Michael Romano, Tucson, Ariz., for appellee.

Before JONES, VOLINN and RUSSELL, Bankruptcy Judges.

## OPINION

VOLINN, Bankruptcy Judge:

This is an appeal from an order denying appellant's motion for restriction of debtor's use of cash collateral in the form of rents and for adequate protection. The bankruptcy court denied the motion and ordered that accumulated net rents be turned over to the trustee without restriction or condition as to use. We reverse.

## FACTS AND PROCEDURAL BACKGROUND

Debtor and appellee Tucson Industrial Partners (TIP), an Arizona limited partnership, is the owner of a 46,600 square foot industrial building which produces commercial income in the form of rents. The property is presently managed by Tucson Commercial Management (TCM) which collects the rents.

Sears Savings Bank (Sears) is a secured creditor of TIP holding a thirty year note dated January 30, 1984 in the original principal balance of $1,000,000, payable at $10,808.00 per month. The note was secured by a first position, properly recorded deed of trust. The deed of trust grants to Sears, as additional security, an interest in all rents, issues, royalties and profits produced by the subject property.

The debtor, on May 28, 1987, who was in default on its payments on the note, issued an "irrevocable letter of instruction" to the property manager, TCM, by which TCM was directed to disburse all income from the property directly to Sears, after payment of normal operating expenses. This letter, written approximately three months prior to bankruptcy, stated:

Please consider this letter as your irrevocable instruction from Tucson Industrial Partners that all sums presently held by you in your account concerning the above property and all sums coming due from the tenants in the future shall be disbursed first to normal operating expenses and then directly to lien holders in

their order of priority. No sums shall be disbursed to Tucson Industrial Partners unless all recorded lien holders are current.

A copy of this letter was sent to Sears. It is difficult to glean from the record what the effect of this letter was. However, despite the letter, it appears that the funds in question were not forwarded by TCM to Sears after bankruptcy but instead conveyed either to the debtor or to Mr. Romano, the debtor's attorney. The record does not indicate what TCM did with the rents for the three months prior to bankruptcy.

In August 1987, Sears declared a default of TIP's obligation and a foreclosure sale was noticed. On August 27, 1987, TIP filed a Chapter 11 petition which stayed the foreclosure sale. After bankruptcy, TCM was retained by the debtor as debtor in possession pursuant to order of the court, to continue to manage the property and collect rents. TIP continued to make use of the rents without application to the bankruptcy court and without the consent of Sears.

Some eight months after bankruptcy, on May 10, 1988, Sears filed a Motion Re Cash Collateral and for Adequate Protection, asserting, *inter alia*, that TIP had accumulated approximately $40,000 in a debtor in possession account after payment of all operating expenses of the building, and that the debtor in possession and its property manager had violated section 363 of the Bankruptcy Code [1] by using Sears' cash collateral for the payment of operating expenses. The motion further stated that Sears would be willing to stipulate to the use of cash collateral for the payment of operating expenses so long as the net operating income was forwarded to Sears for application on the obligation owing to Sears by TIP; that the debtor in possession had received neither consent from Sears as to the use of cash collateral, nor had it applied to the bankruptcy court for an order governing the use of cash collateral. Sears also asserted that pursuant to §§ 361–362,

---

1. Unless otherwise indicated, all section references are to the Bankruptcy Code, Title 11,

U.S.C. §§ 101–1330.

estate turn over of all net operating income was necessary in order to afford Sears adequate protection of its interest in the collateral because a substantial equity cushion above its security interest was lacking.

The debtor contends that prior to the filing of the bankruptcy it paid Sears approximately $40,000 of net operating income, plus an additional $19,500 of condemnation proceeds, for a total of some $60,000, and that it was entitled to a further credit of approximately $20,000; that it was not in default under the Sears loan at the time of bankruptcy and that as a result of the allegedly improper determination of default and filing of a notice of a trustee's sale, the debtor was forced into bankruptcy. The record does not indicate that the trial court made any findings on these issues.

During one of the three evidentiary hearings on Sears' motion, an employee of Sears, one Marjorie Foster, testified that there was a principal balance owing to Sears of $1,116,441.74 less a credit of approximately $19,000.

The record shows that the appraiser, called by Sears, testified that the value of the collateral was $900,000 and could go lower. He testified that there was a huge surplus of industrial income property in the Tucson area and that at the time there was "a dead market right now of Tucson industrial property." The record before us does not indicate testimony controverting the appraisal.

At a hearing held on June 6, 1988, the court ordered TIP to sequester all the net operating income from the subject property pending a continued hearing and that the funds be held in the trust account of debtor's attorney, D.M. Romano. At the time of the debtor's response to Sears' motion, $50,600 had accumulated in the trust account, representing the net operating rental income through May 31, 1988. On the same date, June 6, 1988, a trustee was appointed for the debtor and, as indicated below, the accumulated net rentals were turned over to him.

## THE ASSIGNMENT AND THE STATUTE

The pertinent Arizona statute, Arizona Revised Statutes Annotated ("A.R.S.") § 33–702(B), provides in part:

B. A mortgage or trust deed may provide for an assignment to the mortgagee or beneficiary of the interest of the mortgagor or trustor in leases, rents, issues, profits or income from the property covered thereby, whether effective before, upon or after a default under such mortgage or trust deed or any contract secured thereby, and such assignment may be enforced without regard to the adequacy of the security or the solvency of the mortgagor or trustor by any one of the following methods:

1. The appointment of a receiver.

2. The mortgagee or beneficiary taking possession of the property, or without the mortgagee or beneficiary taking possession of the property.

3. Collecting such monies directly from the parties obligated for payment.

4. Injunction.

The language of the assignment of rents provided by the debtor was drafted to fit the language of the statute. The deed of trust provides for assignment to the Beneficiary of:

All rents, ... if trustee shall default as aforesaid, Trustor's right to collect any such rents shall cease and Beneficiary shall have the right, with or without taking possession of the property affected hereby to collect all rents, ... without bringing any action or proceeding, or by receiver to be appointed by the court....

There are two provisions of the foregoing statute providing for collection of the rents which might have been applicable pre-bankruptcy on the facts of this case. First, A.R.S. § 33–702(B)(2) provides that the assignment of the rents becomes effective simply on default "without the mortgagee or beneficiary taking possession of the property." This provision was not presented or argued by the parties either at the trial level or on appeal. The other provision, sub-part (B)(3), relates to the ir-

revocable letter of instruction written on May 28, 1987, by the debtor to TCM. While the letter provides for disbursement of any net rental collections to lien holders (after payment of operating expenses) in their order of priority until they are current, no evidence was presented as to any accounting of these rents.

It appears that TCM and the debtor did not honor the letter. However, while Sears adverted to the letter in the proceedings below and on appeal, its significance, factually and legally, was not fully articulated to the trial court nor on appeal. We are of the view that consideration of these two statutory provisions, because of the lack of a record with respect thereto, does not provide sufficient grounds for any ruling independent of or supplemental to the reasons for the ruling set forth in this opinion.

## CONTENTIONS BEFORE THE TRIAL COURT AND ITS RULING

The debtor in its response to Sears' motion took the following position:

1. Rents collected up to May 10, 1988 (the date of Sears' motion) are not cash collateral and can be retained by TIP "For use in connection with operation of the subject property without Sears' consent."
2. If the pre-May 10 rents and profits are cash collateral, that Sears be found to be adequately protected and that all post-petition rents be retained by debtor for use in connection with operation of the subject property without Sears' consent.
3. If the court finds Sears is not adequately protected, that the cash collateral be used for the benefit of the property.

At the conclusion of the final hearing, the debtor's counsel, Mr. Romano, asked the court the following question:

MR. ROMANO: Your Honor, before you go can I just ask a question about the trustee? I have about $50,000 in my trust account from the previous proceeding, would you like me to turn that over to the trustee?

THE COURT: Absolutely.

An order accordingly was presented to and entered by the court which provided:

... And Sears having objected to the debtor's use of cash collateral of Sears, specifically, rents being generated by the Debtor's property since Sears has objected to the debtor's use of cash collateral,

IT IS ORDERED that Sears objection to the Debtor's use of cash collateral is overruled and the Motion denied.

In the light of the issues framed by the pleadings and briefs, and the record of the proceedings, it appears that the court ordered that the debtor be allowed unrestricted access to and use of the rents without any recognition of the secured creditor's interest in or rights thereto. This ruling did not address the debtor's position in its response claiming unrestricted use of the rents collected up to the date of Sears' motion, some eight months after bankruptcy. The debtor continues to maintain this position on appeal.

## ISSUE

The basic issue before us is whether under state law the rents received by the debtor were subject to a secured interest by Sears and if so, the effective date of such secured interest; and further, the interaction of the secured creditor's rights to the rents under state law with the cash collateral provisions of section 363 of the federal Bankruptcy Code.

## STANDARD OF REVIEW

The record establishes that the issues presented to the trial court and to this court are predominantly legal. The standard of review is therefore de novo. In re Taylor, 884 F.2d 478, 480 (9th Cir.1989).

## DISCUSSION

### ANALYSIS OF THE TERMS "PERFECTION" AND "ENFORCEMENT"

■ The term "perfection" is usually considered in the context of viability of a security interest under Article 9 of the Uniform Commercial Code (U.C.C.) A se-

curity interest in collateral is perfected as between the debtor and the secured creditor, and between the secured creditor and the unsecured creditors of the debtor, if the security instrument is executed as required by the U.C.C. and thereafter filed or recorded within a specified period of time and at a designated record-keeping agency. When these conditions are met, the creditor's security interest is unassailable by the debtor and its unsecured creditors.

■ With respect to rents, the state of Arizona, as is the case with many other states, has dispensed with the requirements of the Uniform Commercial Code as to execution of a security interest in rents and giving notice thereof to third parties.[2] Constructive notice of a security interest in rents created by an assignment is accomplished by recordation in the same manner as with the real estate which produces the rents. Thus, recordation is equivalent to perfection. The secured party has a perfected security interest in the rents without further action, and is in a position similar to that of a creditor who has received a security interest in accounts receivable and, pursuant to the U.C.C., timely filed notice with the appropriate public agency.

Section 552 deals with the post-petition character of such security interests. Section 552(a) provides that except as provided in subsection (b) of that section:

> Property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.

The exception, section 552(b), provides that:

> Except as provided in section 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and *if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case* and to proceeds, product, offspring, *rents,* or profits of such property, *then such security interest extends to such ... rents ... acquired by the estate after commencement of the case* to the extent provided by such security agreement and by applicable nonbankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise. (Emphasis supplied.)

The various sections cited by section 552(b) provide exceptions to its validation of pre-bankruptcy liens which attach to specified kinds of post-bankruptcy property interests. Some of these sections are relevant to the issues here; others are not. Section 363 deals with the use of the cash collateral by the debtor. This use is subject to the *debtor's* application therefor. The grant of such authority hinges on the debtor demonstrating that the secured creditor is adequately protected either by an equity in the property or by some other assurance. This subject was not dealt with by the court below. Section 522 deals with exempt property and is not pertinent. Section 506(c), which provides for the trustee of an estate charging the secured creditor reasonable and necessary costs of administration, is also not relevant.

■ If the transfer by way of assignment of rents were intrinsically defective or voidable by creditors under Arizona state law, then it would be voidable by the trustee pursuant to section 544 of the Bankruptcy Code, which provides that:

> (a) The trustee shall have, ... the rights and powers of,....
>
> (3) a bona fide purchaser of real property, ... from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the com-

---

2. *An assignment of rents is excepted from the provisions of the Uniform Commercial Code.* A.R.S. § 47–9104 provides:

This chapter does not apply:

....

10. *... except to the extent that provision is made for fixtures in section 47–9313, to the creation or transfer of an interest in or lien on real estate, including a lease or rents thereunder; ...*

mencement of the case, whether or not such a purchaser exists.

■ The only basis for invocation by the trustee of section 544 would have been the failure of the secured creditor to have recorded its assignment pursuant to A.R.S. § 33–702(B). Once recorded, a security interest, albeit unenforced prior to bankruptcy, is nevertheless effective as against the trustee, whether the collateral be real property or rents. This proposition would apply to Sears' lien against the real estate; Sears would not be required to have taken any enforcement step such as a foreclosure sale in order to preclude a claim of interest, free of the lien, by the estate or its creditors. In the context of section 544, there is no apparent reason why there should be a different result as to Sears' interest in the rents.

The remaining sections, 545, 547, and 548 deal with other avoiding powers of the Bankruptcy Code. They are not relevant on the facts before us.

Insofar as "applicable nonbankruptcy law" mentioned in section 552(b) is concerned, had bankruptcy and the automatic stay of section 362 not intervened, Sears would have proceeded with its statutory remedies. It would have completed the foreclosure sale and taken possession of the property and the rents already committed to it; or it would have taken action without taking possession, for example, by directly collecting the rents.

## THE RELATIONSHIP OF STATE LAW AND FEDERAL LAW UNDER THE BANKRUPTCY CODE

■ A leading case on the law relating to secured creditors' rights to collateral in the event of bankruptcy is *Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). As it happened, the Court was concerned with the rights of a secured creditor to rents collected during bankruptcy on the debtor's property which was located in North Carolina. The Court, in dealing with the interaction of state law and federal law under the former Bankruptcy Act, alluded to the basic proposition that state law governed the relationship between the secured creditor and the debtor with respect to assignment of rents. The Court, however, noted that while state law governed:

> The constitutional authority of Congress to establish "uniform Laws on the subject of Bankruptcies throughout the United States" [citing U.S. Const. art. I, § 8, cl. 4] would clearly encompass a federal statute defining the mortgagee's interest in the rents and profits earned by property in a bankrupt estate. *But Congress has not chosen to exercise its power to fashion any such rule....* Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law.

440 U.S. at 54, 99 S.Ct. at 917–18 (footnotes omitted) (emphasis added). Thus, the Supreme Court, prior to the present Code, held that while Congress could "clearly" enact a federal statute encompassing and defining the mortgagee's interest in rents, it had not chosen to do so and therefore determination of property rights in the assets of the bankrupt's estate was governed by state law.

*Butner* dealt with a problem created by the diversity in law among the states as to the rights of secured creditors. Because of this variation, case law had developed in the Third and Seventh Circuits providing that federal bankruptcy law affords mortgagees an "automatic security interest in rents and profits when state law would deny such an automatic benefit and require the mortgagee to take some affirmative action before his rights are recognized." 440 U.S. at 56, 99 S.Ct. at 918. As indicated, the Court held that where there was no federal law, bankruptcy courts should "take whatever steps are necessary to ensure that the mortgagee is afforded in federal bankruptcy court the same protection he would have under state law if no bankruptcy had ensued." 440 U.S. at 56, 99 S.Ct. at 918.

Thus, *Butner*, because of the absence of a federal controlling statute, held that state law would govern. One result of *Butner* was that it had the effect of reviving a troublesome issue of long standing

for bankruptcy courts, that is, the relationship of bankruptcy to security interests in rent.[3]

As distinguished from security interests in personal property, particularly under the U.C.C., rents, as proceeds of real estate, bring into play concepts relating to enforcement of a lien against real estate and its attendant history of lien versus title theory. These concepts involve deferring rights a secured creditor may have in real estate until the creditor has acquired sufficient possession or dominion over the collateral.

Legislatures in more recent times have passed legislation affording to secured creditors far freer recourse to personal property collateral than had been previously available to them. While there has also been legislation affording freer recourse to real property collateral, e.g., nonjudicial deed of trust foreclosures, nevertheless, formalities and procedures of the past have not been as completely displaced as provided by the Uniform Commercial Code relating to personal property liquidation. Thus, courts, with respect to foreclosure of interests in real property, have continued to look to substantive and technical requirements rooted in historical concepts.[4]

## OVERVIEW OF CASE LAW

Since the enactment of the Bankruptcy Code in 1978, case law relating to the rent assignment issue before us has been substantial.[5] There appear to exist three different lines of cases presenting divergent approaches. Bankruptcy courts in Arizona are themselves in conflict in this area.

One view is represented by the case of *In re Multi-Group III Ltd.*, 99 B.R. 5 (Bankr. D.Ariz.1989), and is apparently the approach taken by the trial court in the case before us. There the secured creditor held a first lien on debtor's apartment building and an absolute assignment of rents. The debtor was in default with $5.9 million due on the note at the time it filed the Chapter 11 bankruptcy. The creditor filed a Notice of Non-Consent to the Use of Cash Collateral and a Motion to Prohibit Use of Funds and to Sequester Rents. The court held that under Arizona law an assignment, even though absolute in form, did not pass title to rents until enforced,[6] and that

---

3. In Note, *The Mortgagee's Right to Rents After Default*, 50 YALE L.J. 1424 (1940–41), the following statement appears at the outset:

> Despite his favored position in the hierarchy of creditors, the mortgagee has not been spared the perplexities which have attended debt collection during the past decade.... The rights of the mortgagee vary widely from state to state, and decisions conflict even within a single jurisdiction. Though the distinction between the so called "title" and "lien" states does not seem to control, vestiges of this historical dichotomy still appear in the theories upon which the mortgagee's right to collect rent is predicated.

4. For a description of the relationship of foreclosure statutes dating back to 1869 to present day assignments of rents *see In re Park at Dash Point L.P.*, 121 B.R. 850 (Bankr.W.D.Wash.1990), *aff'd mem.*, No. C91–234C (W.D.Wash. June 28, 1991); for an in-depth treatment of the history of assignments of rents in bankruptcy and cogent analysis of current treatment of the issue, see McCafferty, *Assignment of Rents in the Crucible of Bankruptcy*, 94 COMM.L.J. 433 (1989) (hereinafter "McCafferty").

5. *See In re Rancourt*, 123 B.R. 143, 146 (Bankr. D.N.H.1991) which stated:

> Indeed, while the briefs on this matter have been well-prepared and quite extensive on all possible issues raised by the question, the courts' delay in taking further action on this matter is largely due to the Court not being able to focus at first on the real issues necessary for decision. In essence, the Court has been swimming around in a "school of red herring" supplied by all the interesting but irrelevant extraneous legal and metaphysical questions presented by the parties.

> *See also* Note, *The Mortgagee's Rights to Rents and Profits Following a Petition of Bankruptcy*, 60 IOWA L.R. 1388 (1975); Randolph, *When Should Bankruptcy Courts Recognize Lenders' Rents Interests?*, 23 U.C.DAVIS L.R. 833 (1990); Averch, *Revisitation of the Fifth Circuit Opinions of Village Properties and Casbeer*, 93 COMM.L.J. 518 (1990); Conti, *Assignments of Rents in Bankruptcy; There is Hope for Secured Creditors*, NORTON BANKRUPTCY LAW ADVISER, May, 1991, at 7; McCafferty at n. 5.

6. The court acknowledged that there was authority to the contrary, citing *In re Ventura–Louise Properties*, 490 F.2d 1141 (9th Cir.1974) (applying California law); *In re Stapp*, 641 F.2d 737 (9th Cir.1981) (interpreting Nevada Law). These cases, holding that an absolute assignment effected a present transfer of the rents, were held inapplicable under Arizona law.

If the Section 552(b) condition that the rental assignment extend to rents means that the lender must possess title to those rents "before commencement of the case," then, absent pre-petition enforcement, assigned rents are not cash collateral pursuant to Section 552(b).

*Id.* at 10–11.

The bankruptcy court concluded that because the assignment was not perfected or enforced prior to bankruptcy, it was unenforceable and the rents subject to the rights of the debtor's unsecured creditors:

> Neither [*United Savings Assoc. of Texas v.*] *Timbers* [*of Inwood Forest*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988)] nor A.R.S. Section 33–702(b) would prevent relief from stay to perfect or enforce an assignment of rents *after* collection of a sum that would ultimately be sufficient to pay unsecured creditors other than the assignee. Rents may *then* become cash collateral without constituting a preference and without diminishing the protections afforded by state law.

*Id.* at 11 (emphasis added).

The court thus ruled that the trustee would have the benefit of what was, in effect, the avoidance of a secured interest where the creditor had not acted "to perfect or enforce" the defaulted debt prior to bankruptcy. There are other cases that reach a similar holding, to the effect that notwithstanding section 552(b)'s recognition of a post-bankruptcy interest in rents, the trustee can nonetheless avoid these interests pursuant to section 544 where the creditor has failed to enforce or perfect prior to bankruptcy. *See In re Kearney Hotel Partners*, 92 B.R. 95 (Bankr. S.D.N.Y.1988); *In re Erickson*, 83 B.R. 701 (Bankr.D.Neb.1988); *In re Selden*, 62 B.R. 954 (Bankr.D.Neb.1986). A related group of cases hold that the secured creditor is limited to state law remedies: *Virginia Beach Federal Sav. & Loan v. Wood*, 901 F.2d 849 (10th Cir.1990) (holding that possession or appointment of a receiver under Oklahoma law is necessary and that a pledge of rents as collateral is void as against the public policy of the state of Oklahoma); *In re Gotta*, 47 B.R. 198 (Bankr.W.D.Wis.1985) (holding that Wisconsin law requires possession or appointment of a receiver for perfection of an assignment of rents). *See also In re Johnson*, 62 B.R. 24 (9th Cir. BAP 1986) (lift of the stay to permit the secured creditor to proceed with foreclosure did not provide creditor a present right to collect the rents pursuant to the assignment); *In re Association Center Ltd.*, 87 B.R. 142 (Bankr. W.D.Wash.1988) (refusing to grant a motion for "sequestration of rents" because there was no provision for such a motion under Washington state law [which provides for the appointment of a "receiver"] nor, presumably, under federal law). The foregoing cases give little or no attention to the sequestration provision of section 363. They explicitly or implicitly characterize the lien of the assignment as "inchoate" prior to enforcement, and therefore subject to interception by bankruptcy. In our view, the assignment of rents lien is complete on execution and recordation. Upon perfection, there is nothing further for the creditor to do, as would be the case, for example, with a materialman's lien. In any event, section 101(33), which defines the term "lien" broadly, has eliminated the distinction between choate and inchoate liens. In *In re Somero*, 122 B.R. 634, 641 (Bankr. D.Me.1991), the court states:

> Title 11 U.S.C. § 101(33) defines "lien" as a "charge against or interest in property to secure payment of a debt or performance of an obligation." The definition is purposefully broad, and lien is defined, per legislative history, to include "inchoate liens." Even if the Bank's lien was considered "inchoate" the lien would be included within the meaning of lien used in sections 363 and 552 and thus the rents on which it has a lien would be deserving of protection as cash collateral.

*In re American Continental Corp.*, 105 B.R. 564 (Bankr.D.Ariz.1989) is representative of the second line of cases. This court held that the secured creditor's right to the rent would accrue, even in the absence of pre-bankruptcy enforcement, when it affirmatively made known in the bankruptcy

court its desire to terminate the defaulting debtor's use of the rents:

> This Court believes that, initially, if a secured creditor files a notice of objection to the use of cash collateral or a notice of perfection in cash collateral, the secured creditor has obtained a perfected security interest in the rental proceeds pursuant to Arizona law. However, obtaining a perfected security interest in the rental proceeds is not the end of the inquiry. If the secured creditor does not wish to be deemed to have impliedly consented to the debtor's use of cash collateral, on even an interim basis, the secured creditor to be consistent with the *Johnson, Butner* and *Village Properties* decisions, should also file a motion for sequestration of cash collateral or to prohibit the use of cash collateral. The filing of such a motion, in turn, requires the debtor to file a motion to use cash collateral. Presumably, the court would then, at one hearing, address the issue as to whether the debtor may use cash collateral.

*Id.* at 576.

*American Continental* is in accord with other cases holding that if the assignee of the rents takes some positive step by way of asserting or claiming the rents in the bankruptcy court, then the creditor will be entitled to post-bankruptcy rents from the date of that claim. The leading cases in this area are from the Fifth Circuit: *In re Village Properties, Ltd.,* 723 F.2d 441 (5th Cir.1984) (where the complaint to modify the stay was sufficient), and *In re Casbeer,* 793 F.2d 1436 (5th Cir.1986) (where the motion for relief from stay was a triggering event). *See also Saline State Bank v. Mahloch,* 834 F.2d 690 (8th Cir.1987) (which held that under Nebraska law the secured creditor had no lien or ownership of rents and profits until the filing of a petition to sequester same).

These cases rationalize the secured creditor's access to the rents by virtue of a post-bankruptcy act of perfection. The justification for so holding inheres in section 546(b) which is held to permit post-bankruptcy perfection of the security interest as of a pre-petition date of the assignment even though the affirmative act did not occur until after bankruptcy. In *Village Properties,* the predecessor to *Casbeer,* the Fifth Circuit discussed various Texas state court rulings which held that an assignment of rents was not effective until the secured party obtained possession of the real estate either through sale or appointment of a receiver or by "some other similar action." *In re Village Properties, Ltd.,* 723 F.2d at 443. However, the court held that while sections 552(b) and 363(a) had not changed or affected prior bankruptcy law, section 546(b) [7] did effect a change by providing for perfection of the assignment through the post-bankruptcy action of giving "notice within the time fixed by law...."

In *Casbeer,* the secured creditor filed a sequestration motion about a month after bankruptcy. The Fifth Circuit ruled that while notice of foreclosure prior to bankruptcy without a sale did not amount to perfection, the motion for sequestration in the bankruptcy court did constitute such perfection and that this "perfection" related back to the pre-bankruptcy assignment and blocked the lien's avoidance under section 544. However, despite the relation back, the motion for sequestration was deemed effective only from and after the date it was filed.

The use of section 546(b) to justify post-bankruptcy validity of an unenforced rent assignment is difficult to support on the basis of legislative purpose or logic. Section 546(b) is referred to in section 362(b)(3)

---

7. Section 546(b) provides:

   The rights and powers of a trustee under sections 544, 545, 549 of this title are subject to any generally applicable law that permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of such perfection. If such law requires seizure of such property or commencement of an action to accomplish such perfection, and such property has not been seized or such action has not been commenced before the date of the filing of the petition, such interest in such property shall be perfected by notice within the time fixed by such law for such seizure or commencement.

as an exception to the automatic stay which permits "any act to perfect an interest in property to the extent that the trustee's rights and powers are subject to such perfection under section 546(b) of this title...." Section 546(b) permits a secured party, despite intervention of bankruptcy, to take full advantage of a specific time period granted by applicable law, usually a state statute, in order to complete the perfection. Such statutes include the U.C.C. (providing ten days for security interests) and mechanic's and materialmen's liens (providing a certain number of days from the date of cessation of the work or furnishing of the material). However, the statutes which provide for recordation of real estate interests do not contain such a specific time period. There is nothing in the Arizona statute nor in other state recording statutes which makes any provision for a specific open period for recording and for relation back to the date of execution of real estate interests. Since section 546(b) hinges on the existence of such a state law, the use of this section is misplaced.

More recently, a third line of cases have dealt with the issue in a manner which, in our view, more appropriately reflects the Congressional intent underlying section 363, the cash collateral provision of the Bankruptcy Code. The starting point for this discussion is the previously cited language of *Butner* which limited its holding to the law as it then existed, noting that:

> "The constitutional authority of Congress to establish "uniform Laws on the subject of bankruptcies" would clearly encompass a federal statute defining the mortgagee's interest in rents and profits earned by the property in a bankruptcy estate. *But Congress has not chosen to exercise its power to fashion any such rule.*"

440 U.S. at 54, 99 S.Ct. at 917 (emphasis added). We also note that *Butner* further states:

> [o]ur decision avoids the ... inequity of depriving a mortgagee of his state-law security interest when bankruptcy intervenes. For while it is argued that bankruptcy may impair or delay the mortgag-

ee's exercise of his right to foreclosure, and thus his acquisition of a security interest in rents according to the law of many States, *a bankruptcy judge familiar with local practice should be able to avoid this potential loss by sequestering rents or authorizing immediate state-law foreclosures.*

*Id.* at 56–57, 99 S.Ct. at 918 (emphasis added).

The foregoing quotations demonstrate that *Butner* did not preclude the impoundment, after bankruptcy, of cash collateral. In any event, the Court's language suggested or intimated that Congress could examine and take action with respect to this problem. Section 363 of the 1978 Bankruptcy Code, as shown by its legislative history referred to below, was responsive to the issue referenced in *Butner*.

A number of cases have have recognized the applicability of section 363 to rents. These cases hold that this section requires that rents be held subject to sequestration as cash collateral. In *In re Rancourt*, 123 B.R. 143, 148 (Bankr.D.N.H.1991), Judge Yacos stated:

> The inevitable conclusion from the foregoing [review of cases] is that the mortgagee's rights with regard to rents as a type of collateral is an "interest" in property within the meaning of section 363(a) of the Bankruptcy Code and is a "security interest [that] extends to ... rents ... to the extent provided by [the] security agreement and by applicable nonbankruptcy law...." within the meaning of § 552(b) of the Bankruptcy Code. That being so the rights of the mortgagees in the present cases, with regard to rents relating to the mortgaged properties, are "cash collateral" under the Bankruptcy Code.

> The conclusion set forth in the preceding paragraph is also inescapable since this court can see no principled way to support a ruling that the mortgagees involved in the present matter have no "cash collateral" security interest in rents, simply because pre-bankruptcy they did not have any *effectuated* right to *collect* specific rent payments, when no court has held, or would hold, that a

secured creditor with a perfected "floating lien" security interest in accounts receivables and other revolving types of collateral would not be entitled to § 363 cash collateral protection simply because there had been no default or effort to collect specific items of collateral prior to the bankruptcy proceeding.... I believe the trend in all states is in this direction.

This view—that properly recorded security interests in rents survives the bankruptcy filing under section 552(b)—also serves to discourage "races to the courthouse" by parties who, in the pre-bankruptcy context, are concerned about defaulted secured debts. *In re Metro Square,* 106 B.R. 584, 588 (D.Minn.1989). In *Metro Square,* the district court, on appeal, reversed the summary judgment of the bankruptcy court that the right of the bankruptcy estate was superior to the rights of the secured creditor in rents because no enforcement action had been taken prior to bankruptcy. The court concluded:

> The determination that assignments of rent are perfected upon filing will discourage precipitative litigation and will likely result in more cooperative financial work outs between lenders and troubled borrowers. Parties to such assignments will not have the same incentive to engage in a race to the courthouse upon the first hint of default. This interpretation also furthers the purpose of the 1977 amendments to section 559.71 [the Minnesota statute] which intended to make assignments of rents a practical means of securing financing.

*Id.* at 588.

Fundamentally, section 363 provides a basis for balancing the interests of the secured creditor and the debtor. It precludes untrammeled use of the rents by the debtor while providing a mechanism for potential use of the funds by the debtor during a period when the funds are in the possession of the debtor. The need for such an equilibrium is stated in *New York Life Ins. Co. v. Bremer Towers,* 714 F.Supp. 414 (D.Minn.1989). There, Chief Judge Alsop held that under Minnesota law a security interest and an assignment of rents is perfected by properly recording the assignment:

The fact that a creditor did not enforce that perfected interest prior to bankruptcy does not invalidate the interest, it merely stays the enforcement of that interest pending the bankruptcy court's determination of the party's entitlement to it.

If this were not the result, the separateness and distinctiveness of these security interests would be purely illusory. If a creditor can perfect its interest only by actually appointing a receiver or taking possession after filing a notice of default, a debtor can too easily negate the creditor's interest. The possibility that debtors would do this is more than the mere speculation of the court. In *Pavilion Place,* after default, the creditors took steps to notify the debtor of foreclosure and publish public notice of that foreclosure. The debtor filed its petition in bankruptcy the next day. *In re Pavilion Place,* 89 B.R. [36] at 37 [Bkrtcy.D.Minn.1988]. Similarly, in this case New York Life noticed a motion to appoint a receiver. The debtor filed its petition for bankruptcy the day of the scheduled motion, making it impossible for the creditor to obtain a receiver. If the legislature really intended these assignments to be additional security as the statute states, it could not have intended the enforcement of such an interest to be impossible.

*Id.* at 418. *Accord: In re KNM Roswell, Ltd. Partnership,* 126 B.R. 548 (Bankr. N.D.Ill.1991); *In re McCutchen,* 115 B.R. 126 (Bankr.W.D.Tenn.1990); *In re Park at Dash Point L.P.,* 121 B.R. 850 (Bankr. W.D.Wash.1990), *aff'd mem.,* No. C91–234C (W.D.Wash. June 28, 1991); *In re Foxhill Place Assoc.,* 119 B.R. 708 (Bankr. W.D.Mo.1990); *In re Greenhaven Village Apartments,* 100 B.R. 465 (Bankr.D.Minn. 1989).

Finally, our conclusion is supported by the legislative history of sections 363 and 552(b) dealing with rents which explains that these provisions are designed to protect the interests of secured creditors. *In re Somero,* 122 B.R. 634, 640 (Bankr.D.Me. 1991). The House Report states in part:

> Under present law, there is no similar limit on the debtor's ability to use, sell,

or lease soft collateral in the early stages of a reorganization. The protection of the secured creditor is left entirely to the judge. The debtor is usually able to obtain an *ex parte* order authorizing use, sale, or lease of property quickly, the secured creditor then has an uphill battle to have it overturned. The result has often been a serious erosion in secured creditor's rights because soft collateral is often easily dissipated or perishable. The provisions governing to the right of the trustee or debtor in possession to use, sell, or lease soft collateral also require that the secured creditor's interest be adequately protected. *This is protection that secured creditors do not have today. The bill as written is a significant boon to secured lenders.*

H.R.Rep. No. 598, 95th Cong. 1st Sess. 182–183 (1977), *reprinted in* 1978 U.S.CODE CONG. & ADMIN.NEWS, 5787, 6142–6143 (emphasis added) (footnote omitted).

It is apparent that legislative policy contemplated automatic sequestration of rents under section 363. Thus, there is imposed on the debtor the burden of requesting such use conditioned on showing that the secured creditor will not be prejudiced thereby. *Freightliner Market Dev. v. Silver Wheel Freight,* 823 F.2d 362, 368 (9th Cir.1987).

### CONCLUSION

Congress in enacting section 363 intended that cash collateral be automatically sequestered. Rent is cash collateral. The burden of obtaining release of the collateral is imposed on the trustee or debtor. From the date bankruptcy is filed, a defaulted bankruptcy estate may not use the rent without moving for such use and demonstrating that the secured creditor is adequately protected. Failing such a showing, the cash collateral is property of the secured creditor.

Accordingly, the order of the court below is reversed.

1. *E.g., In re Multi–Group III Ltd. Partnership,* 99 B.R. 5, 8 (Bankr.D.Ariz.1989).

2. *Butner v. United States,* 440 U.S. 48, 54–56, 99 S.Ct. 914, 917–18, 59 L.Ed.2d 136 (1979).

JONES, Bankruptcy Judge, dissenting:

I agree with the majority that 11 U.S.C. §§ 363(a) and 552(b), read together, demand that a security interest in rents be "perfected" pre-petition in order for the rents to be classified as cash collateral in bankruptcy,[1] and that state law determines whether and at what time a mortgagee has a "perfected" interest in rents.[2] I also agree that Sears properly recorded its assignment of rents and therefore achieved "perfection" pre-petition pursuant to Arizona law.[3]

However, the "perfection" that comes with recording is a limited perfection—protecting the recording party against subsequently recording parties but giving no present right to receive rents against the title holder of the underlying property. In Arizona, the present right to rents comes only after some "further affirmative act," such as 1) appointment of a receiver, 2) taking possession of the underlying property, 3) directly collecting the rents, or 4) obtaining an injunction. A.R.S. § 33–702(B).

Sears was precluded from performing any of the listed acts when TIP filed for bankruptcy. Therefore, a strict interpretation of Arizona law would deny Sears any relief, a result that gives TIP greater protection under bankruptcy law than under state law. Such a holding would be both unfair and contrary to *Butner v. United States,* 440 U.S. 48, 56, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979).

Apparently because of this unfairness the majority has taken the opposite position, holding that the "perfection" which comes with recording is the same as the present right to receive rents. Such a holding, giving Sears greater rights than it would have received in the absence of bankruptcy, is also contrary to *Butner. Id.*

The BAP has previously addressed this issue, stating that "in the event bankruptcy

3. A.R.S. § 33–412; *see also Waldron v. Northwest Acceptance Corp. (In re Johnson),* 62 B.R. 24, 28 (9th Cir. BAP 1986).

law precludes a mortgagee from acting under state law, the mortgagee may establish its right by sequestering the rents in the bankruptcy court." *Waldron v. Northwest Acceptance Corp. (In re Johnson)*, 62 B.R. 24, 29 (9th Cir. BAP 1986), (citing *Investors Syndicate v. Smith*, 105 F.2d 611 (9th Cir. 1939)). The *Johnson* panel chose to liberally construe state law,[4] allowing acts performed post-petition to replace the "further affirmative acts" required under state law—so long as the substituted acts gave notice of intent to obtain rents. *Johnson*, 62 B.R. at 29 (mortgagee's claim to rents denied because of failure to indicate intent to obtain rents). Sears' objection to the use of cash collateral and its request for adequate protection arguably fulfilled this notice requirement.

I would find that Sears had no present right to rents before it filed its objection to use of cash collateral and motion for adequate protection on May 10, 1988. Therefore, I respectfully dissent.

---

**4.** In the absence of state law mandating a strict interpretation, a liberal construction of the state statute is not inappropriate. *Johnson*, 62 B.R. at 29–30. Nothing in the Arizona statute mandates a strict interpretation. *See generally In re Ven-* *tura–Louise Properties*, 490 F.2d 1141 (9th Cir. 1974); *but see In re Multi–Group III Ltd. Partnership*, 99 B.R. 5, 9 (Bankr.D.Ariz.1989) (the Arizona statute contains no rent sequestration procedures and has no "similar action" clause).