**In re S.F. DRAKE HOTEL ASSOCIATES, a California Limited Partnership, dba Sir Francis Drake Hotel, Debtor.**

**Bankruptcy No. 91–3–00748–LK.**

United States Bankruptcy Court, N.D. California.

Aug. 23, 1991.

---

**157**

Joseph A. Eisenberg, Levene & Eisenberg, Los Angeles, Cal., for debtor.

Jaculin Aaron, Shearman & Sterling, Los Angeles, Cal., for Sec. Pacific Nat. Bank.

## OPINION

LLOYD KING, Chief Judge.

### I. *Introduction*

Debtor in Possession S.F. Drake Hotel Associates (Debtor) filed a petition for reorganization under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101, *et seq.*, on February 25, 1991. Debtor owns and operates the Sir Francis Drake Hotel in San Francisco, California. Before the court is a contested matter in bankruptcy, initiated by secured creditor Security Pacific National Bank's motion for sequestration of rents, and segregation of and an accounting for cash collateral. Debtor filed a cross-motion to determine the extent of Security Pacific's cash collateral, and for authority

to use the cash collateral for normal operating expenses, including repairs and renovations. This court has jurisdiction pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157. This is a core proceeding in bankruptcy. 28 U.S.C. § 157(b)(2)(A), (M).

A hearing was held on July 8, 1991. Jaculin Aaron of Shearman & Sterling appeared on behalf of Security Pacific. Joseph A. Eisenberg and Ron Bender of Levene & Eisenberg represented Debtor.

The issue to be decided is whether the rents, issues, income, and profits clause in a Deed of Trust executed by Debtor operates to encumber the revenue generated from the occupancy of hotel rooms.[1] This issue is of importance for, if this clause does not apply, room revenue generated post-petition appears to be unencumbered "free money," which Debtor may use without restriction. 11 U.S.C. § 552(a). On the other hand, if room revenue is encumbered by the Deed of Trust, those funds are "cash collateral" which Debtor may not use without the consent of Security Pacific or order of the bankruptcy court. 11 U.S.C. § 363(c)(2).

### II. *Facts*

Security Pacific loaned $30,000,000 to Debtor pursuant to a September 26, 1986 Loan Agreement and Promissory Note. This obligation was secured by a deed of trust and assignment of rents, which was recorded under real property law.[2] Furthermore, the parties entered into a personal property Security Agreement, which was perfected by the filing of a U.C.C. Financing Statement. The personal property security agreement purports to create a security interest in room revenues.

The Deed Of Trust granted a first priority lien on the "Trust Estate," which is comprised of "the Property, the Rents, and the Rights" of Debtor. The Deed of Trust

---

**1.** No evidence has been introduced to establish a breakdown of hotel revenue between room occupancy and other sources. This opinion is limited to revenue generated from the occupancy of rooms.

**2.** The rent assignment created a lien only, and was not an absolute assignment transferring

title. The Loan Agreement provides: "5.1 *Nature of Collateral.* The Obligations of the Company under the Loan Documents shall be secured by a first priority lien or security interest in and to the Property and the Leases, subject only to the Permitted Exceptions."

assigned the "Rents" to Security Pacific. "Rents" under the Deed of Trust are defined as "all rents, issues, income, royalties, and profits now or hereafter derived from or payable with respect to the Property or any part thereof or the use or occupancy thereof, including without limitation all rents, issues, income, royalties and profits now or hereafter derived from or payable under the Leases." "Rights" include "all present and future accounts, general intangibles, contract rights...." "Property" is defined to include both the real and personal property of Debtor.

Debtor failed to make the October, 1989, and subsequent payments to Security Pacific, which recorded a Notice of Default on February 16, 1990. Security Pacific gave Debtor an opportunity to sell the hotel. Debtor's efforts to arrange a sale were unsuccessful, and a non-judicial foreclosure sale was scheduled for February 26, 1991. Principal and interest due at that time totalled $34.1 million. Debtor filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code on February 25, 1991.

Debtor has not disputed the validity of the real and personal property security instruments. Debtor argues, however, that room revenue is not "rent" subject to the Deed of Trust provisions and real property law, but rather an accumulation of accounts, in which a security interest can be perfected only under the U.C.C. Under Debtor's reasoning, § 552 of the Bankruptcy Code [3] prevents the pre-petition security interest from applying to post-petition room revenue.

Whenever a room is newly occupied after the date of filing of the bankruptcy petition, a new "account" will be generated. Since debtor did not own such "accounts" pre-bankruptcy, § 552(a) prevents the imposition of a lien under a security agreement which predates the filing of the bankruptcy petition. *In re Investment Hotel Properties, Ltd.*, 109 B.R. 990, 995 (Bankr.D.Colo. 1990). Accordingly, Debtor argues that the post-petition room revenue is not subject to any Security Pacific lien and is not Security Pacific's cash collateral.

### III. *Discussion*

#### A. Rent versus Accounts

Debtor's argument rests primarily on the reasoning of *In re Ashkenazy Enterprises, Inc.*, 94 B.R. 645 (Bankr.C.D.Cal.1986). In *Ashkenazy* the court held that post-petition revenues generated from the operation of a hotel are accounts [4] in which a security interest may only be perfected under U.C.C. Article Nine.

In reaching this conclusion, the court used a two-step approach. First, the court distinguished interests held by a tenant from those held by a hotel lodger. A tenant has an estate in land, while the lodger holds a mere right to use the land. *Ashkenazy*, at 647. Lodgers are excluded from the statutory rights and responsibilities of landlords and tenants. Cal.Civ.Code § 1940(b). The *Ashkenazy* court noted that California Civil Code §. 1863 desig-

---

**3. 11 U.S.C. § 552. Postpetition effect of security interest.**

(a) Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of this case is not subject to any lien resulting from any security agreement entered by the debtor before the commencement of the case.

(b) Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, rents, or profits of such property, then such security interest extends to such proceeds, prod-

uct, offspring, rents, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable non-bankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

**4.** "'Account' means any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper, whether or not it was earned by performance." Cal.Comm.Code § 9106 "'Account' is defined as a right to payment for goods sold or leased or services rendered; the ordinary commercial account receivable." U.C.C. Comment 9–106.

nates charges for rooms in hotels as "rates," not "rents." *Ashkenazy*, at 647. Because a tenant pays rent, and a lodger is not a tenant, the court concluded that revenue from the collection of hotel room rates could not be termed rent.

Second, after finding that hotel revenue was not rent, the *Ashkenazy* court attempted to find an applicable term to describe this revenue. The court found that hotel revenue was generated through the provision of services, including the service of furnishing rooms for use by guests, and not as a product of the underlying real property. *Ashkenazy*, at 647. Therefore, the revenue was an account, subject to Article Nine and not real property law. *Id.*

▪ A bankruptcy court applies state law to determine post-petition the validity of security interests. *Butner v. United States*, 440 U.S. 48, 54–55, 99 S.Ct. 914, 917–918, 59 L.Ed.2d 136 (1979). Admittedly, a tenant's rights and duties differ from those of a lodger. However, that distinction does not compel the conclusion that hotel room revenues are accounts, rather than rents. The fact that the legislature decided to term the compensation for the occupancy of a hotel room a "rate" does not determine whether room revenues are "rents", "accounts" or either or neither.[5] The legislature uses the additional term "room rent" to describe the Innkeeper's lien. Cal. Civil Code § 1861. Black's Law Dictionary defines rent as: "Consideration paid for use or occupancy of property. Compensation or return of value given at stated times for the possession of lands and tenements corporeal." This definition provides no support for the distinction between a tenant and a lodger in determining what is rent.

The *Ashkenazy* court concluded that hotel revenue is generated from the provision of services.[6] Certainly hotels provide services, but so also do apartment and office buildings. Any services that a hotel provides are incidental to room occupancy. The hotel guest's primary objective is shelter. That shelter is provided by the land and improvements of the hotel. A hotelier cannot operate a hotel without the real property and improvements, no matter what the extent of the services provided.

Debtor also attempts to support its argument by reference to two Ninth Circuit Bankruptcy Appellate Panel decisions. In *In re Zeeway*, 71 B.R. 210 (Bankr. 9th Cir. BAP 1987), under Arizona law, gate receipts from an automobile racetrack were found to be excluded from the rents, issues, and profits or income clause of the deed of trust. Drawing analogy to a restaurant or retail business operation, the panel found that the gate revenue was attributable to the services which occur on the property, not the property itself. *Zeeway* is not persuasive here. A hotel operation is unlike a racetrack, restaurant, or retail store, where the primary objective of the customer is to receive a service. The racetrack customer is not primarily concerned with the real property, but rather with the service provided, entertainment.

A closer analogy to a hotel is the operation of a nursing home. In *In re Hillside Associates, Ltd. Partnership*, 121 B.R. 23 (Bankr. 9th Cir. BAP 1990), it was held that nursing home revenues are not rents. However, there health care services dominate the business operation. "That the patients live there is incidental to the fact that the nursing home is providing them with care." *Id.* at 24. By contrast, the generation of hotel room revenue is not predominated by services. Rather, it is primarily derived from occupancy of the real property.

California statutes concerning hotel guests or "lodgers" who pay "rates" do not answer the "rents" versus "accounts" question. The Bankruptcy Code is equally

---

**5.** Even an agreement creating a security interest in hotel "rates", to use the statutory term, would not answer the question of how to perfect that interest.

**6.** One possible explanation for this conclusion is the fact that the only evidence before the court

established that just 39% of the hotel revenue was attributable to the "bare use of the room and property." *Ashkenazy*, at 647. Here, no such breakdown of the components of debtor's revenue from hotel operations has been provided.

barren of guidance on this issue. All that the Code does is to tell what happens if the revenues are either personal or real property. The answers are found in Section 552. If the room revenues which arise from post-petition occupancy are "accounts" or personal property, they are not subject to the lien of a pre-petition U.C.C. security interest. § 552(a). If, on the other hand, the revenues are "rents" or real property, they remain subject to the lien of a pre-bankruptcy mortgage or deed of trust which contains a rents, issues, and profits clause. § 552(b).

There is logical appeal in the suggestion that revenue generated from occupancy of real property, for residential use, is rent. Why should the length of the stay—a day, a week, a month, a year—determine the validity of the parties' security agreement?

It is important to note that, if room revenues are not rents, an agreement to that effect is never valid. Bankruptcy or no bankruptcy, the inclusion of hotel room revenues in a rents, issues, and profits clause will always be void. However, if the room revenues are accounts, then the hotel owner who files a petition for reorganization is suddenly freed from the pre-petition consensual security interest by operation of § 552(a). This emancipation is not available to a debtor who collects rents by operating the real property of the bankruptcy estate as an apartment house or office building. Is the hotel operator more deserving? If so, will it be necessary to make distinctions, for § 552 purposes, between transient hotels and residential hotels having longer periods of occupancy? Can a realistic § 552 line be drawn between residential hotels and apartment buildings?

Similar line drawing problems arise if the "rent" versus "account" distinction is to be made on the basis of services offered. A high class apartment building may offer more services than a lower class hotel. The validity of security agreements should not be contingent upon such vagaries as the length of occupancy or the extent of services provided. Revenues generated by the residential occupancy of real property should be "rents", without reference to term of occupancy or level of services.

The term "account" is unsuitable for hotel room revenues. The operator of a hotel undoubtedly maintains an account for each occupant, as do operators of apartment and office buildings. As a practical matter, a time will come when the owner is entitled to be compensated. The period of occupancy, billable services, and other items will determine the amount due. That generic use of the term "account" does not compel the conclusion that hotel room revenues are accounts for U.C.C. purposes. Nondelinquent commercial accounts receivable which collateralize loans are rarely, if ever, paid across a counter with cash or credit card. The typical commercial account debtor will receive a statement or invoice from the account creditor, usually by mail. Payment will be due in ten days, thirty days, or within whatever time is established by contract or trade custom. The lender who has a security interest in the commercial account will, in the event of default by the account creditor, have the right to intercept unpaid sums owing on the account. This interception is commonly accomplished by means of notice to the account debtor. The operational distinctions between hotel revenue accounts and commercial accounts receivable suggest that judicial determinations that room revenues should be termed accounts, rather than rents, are not compelled by normal commercial practice.

■ Hotel room revenues are, or resemble, rents in that they are a primary component used by appraisers in valuing a hotel. The value of the income stream, rents, is a major factor in determining the value of the real property. The income is what the debtor and the secured lender look to for payment of the loan. To subtract room revenue from the consensual real property security greatly reduces the value of the creditor's collateral package.

Debtor's counsel admits that the conclusion that room revenue is not rent generated by real property is counter-intuitive. That counter-intuitive conclusion, with its drastic effect, lacks a clear foundation. A better foundation is the common under-

standing of rent as compensation for use of property which, taken with the knowledge that a lodger primarily seeks shelter not service, leads to the conclusion that room revenue is rent. As rent, real property law, not the U.C.C., governs perfection of the lien.

### B. Contract Language and Parties' Intention

The Deed of Trust defines "Rents" as "all rents, issues, income, ... and profits now or hereafter derived from or payable with respect to the Property or any part thereof or the use or occupancy thereof...." Authority exists for an argument that the room revenue is "issues" or "profits" derived from the property, and, thus covered under the terms of the Deed of Trust, even if the revenue is not termed rent. *See In re Mid–City Hotel Associates*, 114 B.R. 634 (Bankr.D.Minn.1990).

A similar argument can be made that the revenue is encompassed by the "income" term by applying the Black's Law Dictionary definition of income.[7] However, these are just exercises in semantics. A simpler and more persuasive answer exists: The parties intended that Security Pacific be given a lien in virtually all of the debtor's assets, including the future revenue of the hotel.[8] The parties defined "Rents" broadly so as to encompass all economic benefits derived from the use or occupancy of the hotel. This includes hotel room revenue. With the intent of the parties so clearly stated, no reason exists to use the term "account" to defeat their intent.

### C. Debtor's Cross–Motion

Debtor's cross-motion for permission to use cash collateral need not be decided at this time. At the time of the hearing, the parties entered into a cash collateral stipulation which provides for the payment of normal operating expenses and the segregation of net revenue. This stipulation was read into the record and is the subject of a separate order.

### IV. *Conclusion*

Room revenue is rent, not an accumulation of accounts. As rent, room revenue is covered by the rent, issues, income, and profit clause of the Deed of Trust. By broadly defining "Rent" under the Deed of Trust, parties intended to encumber room revenues. No legal, equitable, or policy reason exists to frustrate this intent.

The result of this decision is that Debtor may not use Security Pacific's cash collateral without the consent of Security Pacific or a court order. This state of affairs does not present what might appear to be a complete disaster for a debtor in possession. Both parties want the property to continue to generate revenue. The debtor is interested in its economic survival. The secured creditor wants to keep the property operating and generating rents in order to pay operating expenses and debt service until a final outcome is reached, through the debtor's confirmation of a plan of reorganization or the creditor's foreclosure. Not surprisingly, the parties have stipulated to Debtor's use of Security Pacific's cash collateral.

Security Pacific's cash collateral motion should be granted.

---

7. Black's Law Dictionary defines income as: "The gain from one's business, labor, or capital invested; gains, profits, or private revenue."

8. The Loan Agreement granted a first priority lien and security interest in debtor's real and personal property, subject only to a narrow group of permitted exceptions such as real estate taxes and assessments, leased equipment, and purchase money security interests. Loan Agreement, Article 5.