**In re NORTHPORT MARINA ASSOCIATES, Debtor.**

**Bankruptcy No. 091–71609–21.**

United States Bankruptcy Court,
E.D. New York.

Feb. 5, 1992.

Platzer, Fineberg & Swergold by Sidney G. Platzer, Spitzer & Feldman by M. James Spitzer, Jr., New York City, for debtor.

Robinson, St. John & Wayne by David H. Stein, New York City, for Citibank, N.A.

Epstein, Becker & Green, P.C. by Daniel R. Wotman, New York City, for North Unity.

Thelen, Marrin, Johnson & Bridges by Daniel L. Saxe, New York City, for Cashman.

Scott Stuart, Office of the United States Trustee, E.D.N.Y., Garden City, N.Y.

## OPINION

CECELIA H. GOETZ, Bankruptcy Judge:

Before the Court is a motion by the Debtor, Northport Marina Associates ("Northport") seeking a declaration that its rental income from the property covered by the security interest of Citibank, N.A. ("Citibank") is not subject to Citibank's pre-petition security interest. The Debtor's motion is a cross-motion to motions by Citibank for various relief, including relief from the automatic stay. Citibank wanted to continue with a pre-petition foreclosure proceeding. This Court granted Citibank's motion for relief from the Section 362 stay for the reasons set forth in an Opinion dated January 9, 1992, 136 B.R. 903. The Court elected to consider the Debtor's cross-motion separately; it is that cross-motion which is the subject of this Opinion.

Granting Citibank relief from stay renders largely academic the Debtor's cross-motion since Citibank presumably will resume its foreclosure proceeding in which it requests the appointment of a receiver for the rentals generated by the real property. Under New York law, the appointment of a receiver will resolve, at least as to the future, the issues raised by the Debtor's cross-motion. Nevertheless, since those issues may still have some pertinency with respect to monies now in the Debtor's possession, the Court will rule on the Debtor's cross-motion.

Familiarity with this Court's earlier Opinion is assumed and the facts found there apply to the Debtor's cross-motion which was not the subject of a separate hearing. For clarity, however, the pertinent facts are set forth again in summary fashion.

The Debtor, which filed voluntarily under Chapter 11 on July 19, 1991, owns and operates a marina and recreational complex located in the Village of Northport, Long Island, New York (the "Subject Property"), a waterfront community on Long Island Sound. The Subject Property constitutes substantially all of the assets of the Debtor and is essential for the successful maintenance of its business.

The property consists of 310 boat slips bordered by floating docks, two buildings, sun decks, a swimming pool, and two tennis courts. When completed, the facilities building will include a lounge area, exercise rooms, cabanas, a sauna, snack bar, locker rooms and storage areas. The property also includes a retail complex, an open boat display and storage area and on site parking. Until 1991 the Subject Property was undergoing construction and is now entering into its first year of full operation.

At the present time the boat slips are rented out to individuals but the property was developed with the intention of operating it as a "dockominium." If it were so operated, the boat slips would not be leased but would be sold; each dockominium unit would comprise a boat slip and a percentage share of the common interest in various other amenities.

Citibank financed the development and construction of the Subject Property through a series of notes and mortgages beginning in 1986. In all, it lent the Debtor $18,136,527. As of the date the Debtor filed, it conceded it owed Citibank $19,746,210.08 on principal and accrued interest. Citibank claims another $1,626,111.20. Northport claims an offset against the debt to Citibank based on the allegations in a lender liability lawsuit filed in November 1990.

In addition to the mortgages which Citibank took on the Subject Property, it also took an assignment of all leases of, and of

all rents from, the Subject Property. A Mortgage Modification Agreement was entered into on October 27, 1988, modifying the outstanding mortgages to include the terms of Exhibit B which is captioned "Building Loan Mortgage, Assignment of Leases and Rents and Security Agreement." The "Granting Clause" of this Exhibit reads in part:

> [T]he Mortgagor ... hereby gives, grants, bargains, sells, warrants, aliens, remises, releases, conveys, assigns, transfers, mortgages, hypothecates, deposits, creates a security interest in, pledges, sets over and confirms unto the Mortgagee all of its estate, right, title and interest in ... all of the following described property ... whether now owned or held or hereafter acquired:
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> (d) the Intangibles;
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> (f) all leases of *all* or any portion of the Mortgaged Property now or hereafter entered into and all right, title and interest of the Mortgagor thereunder, including, without limitation, any cash or securities deposited thereunder, to secure performance by the lessees of their obligations thereunder, whether such cash or securities are to be held until the expiration of the terms of such leases or applied to one or more of the installments of rent coming due immediately prior to the expiration of such terms, including, further, the right, upon the happening of an Event of Default, to receive and collect the *rents* thereunder; ...

Exhibit C–6, pp. 2–3 (emphasis supplied).

The Agreement further provides:

> During the continuance of any such Event of Default ... the Mortgagee shall be entitled to collect and receive all *earnings, revenues, rents,* issues, profits and *income* of the Mortgaged Property, and every part thereof, all of which shall for all purposes constitute property of the Mortgagor; and in furtherance of such right the Mortgagee may collect the *rents* payable under all leases of the Premises directly from the lessees there-

under upon notice to each such lessee that an Event of Default exists hereunder accompanied by a demand on each such lessee for the payment to the Mortgagee of all rents due and to become due under its lease....

Exhibit C–6, p. 18 (emphasis supplied).

At the same time, Citibank filed a UCC financing statement which claims a security interest in "[a]ssignment of rents, condemnation awards, hazard insurance proceeds and all fixtures, furnishings, fittings, appliances, apparatus, equipment, machinery, boilers, building materials, oil burners, power systems, air conditioning units, elevators, chattels, and articles of personal property ..." (Exhibit C–11). It does not claim a security interest in accounts receivables, licenses, permits, intangibles or in the proceeds derived therefrom.

The Debtor defaulted under its various notes and mortgages on September 1, 1990 and has made no payments to Citibank since that date. In November 1990, the Debtor sued Citibank in the New York State Supreme Court claiming that Citibank wrongfully cut off funding.

On May 6, 1991, Citibank filed a complaint in the Supreme Court of the State of New York against Northport for foreclosure of mortgage in which it requested the appointment of a receiver to collect rents, but no receiver was appointed before the action was stayed by the Debtor's filing of a Chapter 11 petition.

On July 25, 1991, Citibank, pursuant to 11 U.S.C. § 546(b), filed with the Clerk of this Court a Notice of Security Interest and a Demand for Segregation of Cash Collateral and Objection to Use of Cash Collateral.

Thereafter, two cash collateral Orders were entered by this Court. One allowed the Debtor to use cash collateral in an amount not to exceed $5,000 and the other authorized a similar amount, but not to exceed $10,000. The Orders gave Citibank a super-priority, post-petition replacement lien on all assets of the Debtor to the extent of the Debtor's use of its cash pursuant to these Orders.

Other creditors hold liens: Northport Holding Corp. holds a junior mortgage for $5 million; J.M. Cashman, Inc. claims a mechanic's lien which has been bonded. Real estate taxes are owed.

### The Rental Agreements

The Debtor's principal income is derived from providing boat slips and boat storage.

The "Winter Storage and Service Agreement" covers the period from November 15th to April 1st and calls for payment dependent on the length of the boat. The agreement reads in part:

When a boat enters the Marina for winter storage, whether inside or out, dry or wet, slip rental, sale or for any other purpose, it shall be located where ordered, moved and maneuvered in the Marina's sole discretion. The Marina may move the boat from location to location at its sole discretion at any time. The Marina may also move any boat to a location off the Marina's property at its sole discretion.

The Debtor is able to provide wet storage even in the winter because it has a "bubbler" system that provides anti-ice protection. About 800 boats stay in the water at the marina during the winter season. The marina provides security for these boats, checks to see whether or not they are taking on water, and cleans off the snow. Some of the boat owners are slip customers, some of them are owners who moor their boats during the season in the mooring field, which is not owned by the Debtor.

The corresponding warm weather agreement is entitled "Slip Rental Service and Membership Agreement." It covers the season from May 1st to October 31st. Under the agreement, slip space or dinghy dockage is rented at so much per lineal foot. The number of the slip which is rented is designated on the agreement. One of its provisions reads:

When a boat enters the Marina for any reason, whether by land or water, it shall be located where ordered, moved and maneuvered at the Marina's sole discretion. The marina, or its designee, may move the boat from location to location at its sole discretion at any time. In the event of a violation of this agreement by Owner, the Marina, or its designee, may move any boat to a location off the Marina's property at its sole discretion, provided however, that the Marina shall be adequately insured.

The agreement also provides:

... if an Owner expects to have his boat out of a slip overnight or longer, he shall notify the Marina in advance as to his estimated time of return, to insure that his slip will be vacant upon his return. The Marina reserves the right to sell, rent, occupy or use any vacant slip or storage area, and the Marina shall be entitled to all proceeds of any such use or rental.

All members are granted the right to use all the facilities of the complex and to obtain all available services. The Debtor furnishes persons renting slips various services, including security, assistance in loading or unloading groceries, supplies and personal property, boat maintenance and repair, and the services of a boat master and dock attendant.

Although a customer signing an agreement for marine storage or rental does not obtain the exclusive right to any particular area since the contract gives the marina the right to move a boat, the expectation is that during the season the assigned slip will be available at all times to the customer as is shown by the clause in the agreement requiring the owner to notify the marina of the anticipated time of return where a boat has been out of its slip overnight or longer, so the marina can "insure that his slip will be vacant upon his return."

In the event the customer violates the agreement, the Marina may cancel all agreements on three days notice and the owner must remove his boat from the marina.

The Debtor also derives some of its income from transient boats. Individuals or boating clubs bring their boats into the marina, pay a per-foot-per-day charge, and

stay for a night or two. (Tr. October 18, 1991, p. 119).

This is a core proceeding over which this Court has jurisdiction of the subject matter and parties pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(A), (K).

## DISCUSSION

The Debtor contends that the revenues generated by the marina are post-petition accounts receivable and are not rent and, therefore, are not subject to Citibank's pre-petition security interest. Furthermore, even if they are covered, Citibank, the Debtor contends, is barred by 11 U.S.C. § 552(a) from claiming a security interest in post-petition revenues, and does not fall within the exception of § 552(b) because it did not perfect its security interest pre-petition in "rents" and "general intangibles".[1]

The UCC financing statements filed by Citibank refer to rent but do not list "accounts receivables" or "general intangibles" as part of Citibank's collateral. Therefore, Citibank would be unsecured with respect to the larger portion of the Debtor's post-petition income if the Debtor's post-petition revenue from slip rentals and store leases are not rents but accounts receivable.

In contending that revenues from boat owners for the use of slips do not fall into the category of rentals, the Debtor relies on cases involving hotels, motels and campgrounds which have held revenues from rooms to be "accounts" (i.e., personal property), rather than rents (i.e., real property). *In re Kearney Hotel Partners*, 92 B.R. 95 (Bankr.S.D.N.Y.1988); *In re Tri–Growth*

*Centre City Ltd.*, 133 B.R. 524, 526 (Bankr. S.D.Cal.1991); *In re Majestic Motel Assoc.*, 131 B.R. 523, 526 (Bankr.D.Me.1991); *In re Northview Corp.*, 130 B.R. 543, 546 n. 4 (Bankr. 9th Cir.1991) (and cases cited therein); *In re Nendels–Medford Joint Venture*, 127 B.R. 658 (Bankr.D.Ore.1991); *In re Shore Haven Motor Inn, Inc.*, 124 B.R. 617 (Bankr.S.D.Fla.1991); *In re Sacramento Mansion Ltd.*, 117 B.R. 592 (Bankr. D.Colo.1990); *In re Blue Ridge Motel Assoc.*, 106 B.R. 81 (Bankr.W.D.Pa.1989); *In re Greater Atl. & Pac. Inv. Group, Inc.*, 88 B.R. 356 (Bankr.N.D.Okla.1988); *In re Ashkenazy Enter., Inc.*, 94 B.R. 645 (Bankr.C.D.Cal.1986). *Cf., In re GGVXX, Ltd.*, 130 B.R. 322 (Bankr.D.Colo.1991) (green fees generated by use of a golf course are not rents).

Not all courts agree, however. *In re S.F. Drake Hotel Assoc.*, 131 B.R. 156 (Bankr.N.D.Cal.1991) takes strong issue with the majority view and says that revenues generated by "the residential occupancy of real property" are rents, and therefore, hotel room revenues are covered by a security interest in rents.

But the motel/hotel cases classifying room rentals as accounts receivable constitute dubious precedent with respect to the seasonal rental of dock space from a marina. Interestingly, where a marina was involved its receipts were simply assumed to be rents. *In re Harbour Pointe Ltd. Partnership*, 132 B.R. 501 (Bankr.D.C.1991).

Seasonal boat owners do not rent for a transitory period like a single night, but in this case for six months, May 1st to October 31st.[2] Each boat owner rents a

---

**1.** Section 552 provides:

(a) Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.

(b) Except as provided in sections 363, 506(c), 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product,

offspring, rents, or profits of such property, then such security interest extends to such proceeds, product, offspring, rents, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

**2.** Even the cases holding room rentals to be accounts receivable suggest that the result might be different "where the terms of the contract between the parties, including the length of the

specific assigned slip. The monthly payment is based upon the lineal foot of the rented slip. The Debtor captioned its seasonal agreement with the boat owner a "Slip Rental Service and Membership Agreement" and the term "slip rental" describes it correctly. It is a rental agreement.

■ By contrast, however, the transient use of space in a marina is like occupancy of a motel/hotel room for a single night. Receipts from such transient use should be deemed accounts receivable and therefore not covered by Citibank's security interest.

■ As to the winter storage, either wet or dry, what little evidence regarding such storage there is in the record, indicates that what is provided is storage rather than the right to occupy a particular space. Sale of a service like storage results in an account receivable and such revenues are, therefore, outside Citibank's security interest.

Of course, revenue from any building leases qualifies as rent.

The Debtor contends that even if the bulk of its income from its retail space and seasonal slip rentals is correctly characterized as rental income, Citibank has not properly perfected its security interest in such income because under New York law neither a mortgagee nor an assignee of the rents is entitled to rents until possession of the property is taken or a receiver appointed to collect rents. A mortgagee is not entitled to collect rents pursuant to an assignment of rent merely upon the occurrence of a default but is required first to obtain the appointment of a receiver or to take other action. Citibank had done neither pre-petition. The Debtor cites *In re Constable Plaza Assoc., L.P.*, 125 B.R. 98 (Bankr.S.D.N.Y.1991); *In re Vienna Park Properties*, 120 B.R. 332. (Bankr.S.D.N.Y.

1990) (applying Virginia law); *In re Riverside Nursing Home*, 100 B.R. 683 (Bankr. S.D.N.Y.1989).

Citibank contends, however, that it does not have merely a security interest in the Debtor's rents but that the Mortgage Modification Agreement gave it an absolute and unconditional assignment of such rents from the date of Debtor's default. *See, In re Charles D. Stapp, Inc.*, 641 F.2d 737, 739 (9th Cir.1981); *In re Townside Partners, Ltd.*, 125 B.R. 8 (Bankr.W.D.Va. 1991).

■ The nature of Citibank's interest is to be determined under New York law. *Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). While it is true that some language of the Agreement on which Citibank relies speaks in absolute terms, that is it appears to convey an immediate right to rents to Citibank, the document in its entirety makes Citibank's right to immediate collection dependent on an "Event of Default" which is consistent with a security arrangement rather than with an outright assignment. *See e.g., Sullivan v. Rosson*, 223 N.Y. 217, 119 N.E. 405 (1918). In New York an assignment of rent clause operates merely as a pledge of rent to which the pledgee does not become entitled until it asserts its rights. *Ganbaum v. Rockwood Realty Corp.*, 62 Misc.2d 391, 393, 308 N.Y.S.2d 436, 438 (Sup.Ct.1970). *See also, In re Constable Plaza Assoc., L.P.*, 125 B.R. 98, 101 (Bankr. S.D.N.Y.1991); *In re Riverside Nursing Home*, 100 B.R. 683, 684 (Bankr.S.D.N.Y. 1989).

■ Similarly, under New York law, a mortgagee is not entitled to collect rent pursuant to an assignment of rent merely upon the occurrence of a default. In the event of default, the mortgagee has an equitable claim to unpaid rents, but this

---

period the room is used, the character of the premises, the nature of the business operated thereon, and the extent of the control or supervision maintained by the proprietor or possessor over the premises might indicate the creation of a tenancy." *In re Kearney Hotel Partners, supra,* 92 B.R. at 99. In addition, New York recognizes that a hotel resident occupying a specific room under a written eleven month

lease is a tenant and not a transient guest to be treated like a transient or traveler at an inn. *Chawla v. Horch,* 70 Misc.2d 290, 333 N.Y.S.2d 531 (Civ.Ct.1972). Such distinctions were rejected in *In re S.F. Drake Hotel Assoc.,* 131 B.R. 156, 160 (Bankr.N.D.Cal.1991), which held all room revenues, regardless of the length of the term of occupancy or level of services to be rents.

equitable lien does not come into force and effect until the appointment of a receiver or the entry into possession by the mortgagee. Until that time the fee owner of the property and not the mortgagee has title to the rents. *New York Life Ins. Co. v. Fulton Dev. Corp.*, 265 N.Y. 348, 193 N.E. 169, 170 (1934); *Sullivan v. Rosson*, 223 N.Y. 217, 119 N.E. 405 (1918); *In re Sterling Bank & Trust Co.*, 21 N.Y.S.2d 566, 569 (Sup.Ct.1940).

Citibank, as part of its foreclosure action, sought the appointment of a receiver, but was stayed when the Debtor filed under Chapter 11. Citibank argues that it perfected its assignment of rent by service of a notice on July 25, 1991 in the bankruptcy court objecting to the Debtor's use of cash collateral. It says that this notice constitutes perfection under 11 U.S.C. § 546(b) and relates back to May 6, 1991, when it filed its foreclosure complaint in which it demanded the appointment of a receiver, before the filing of the Debtor's bankruptcy petition.[3]

The Debtor argues that there can be no relating back under New York law because in New York perfection by the appointment of a receiver speaks as of that date and is not effective against an entity which acquired rights in the property prior to such appointment. *New York Sec. & Trust Co. v. Saratoga Gas & Elec. Co.*, 159 N.Y. 137, 53 N.E. 758 (1899) (rents accruing prior to the taking of possession by mortgagee belong to general creditors); *Colen–Gruhn Co. v. 1133 Washington, Inc.*, 250 A.D. 786, 294 N.Y.S. 551 (App.Div.1937) (assignment of rents by owner intended to be absolute, unqualified and immediate gave assignee right to rents in preference to mortgagee's later appointed receiver); *Vecchiarelli v. Garsal Realty, Inc.*, 111 Misc.2d 157, 443 N.Y.S.2d 622 (Sup.Ct.1980) (senior mortgagee not entitled to rents collected by junior mortgagee prior to establishment of senior receivership); *Ganbaum v. Rockwood Realty Corp.*, 62 Misc.2d 391, 308 N.Y.S.2d 436 (Sup.Ct.1970) (mortgagee holding rent assignment has no cause of action against owner for not using rents collected by owner to pay taxes, sewer and water charges). Further, even assuming that New York would permit such a relation back, the Debtor argues that such perfection would be preferential and voidable under 11 U.S.C. § 547 in that it would constitute a transfer by the Debtor to Citibank within ninety days of the filing of the bankruptcy petition.

Both Citibank and the Debtor predicate their arguments on the view of the law taken in *In re Kearney Hotel Partners*, 92 B.R. 95 (Bankr.S.D.N.Y.1988) and followed in *In re Vienna Park Properties*, 120 B.R. 332 (Bankr.S.D.N.Y.1990). Both *Kearney* and *Vienna Park* involved the right to post-petition rents of a mortgagee which had not perfected its lien pre-petition by the appointment of a receiver. One case involved Nebraska law, the other, Virginia law.

The analysis espoused in those cases is as follows: 11 U.S.C. § 544 enables a trustee, or a debtor-in-possession[4] to avoid any obligation voidable by a judicial lien creditor who gave value, by an unsatisfied execution creditor who gave value, or a bona fide purchaser of real property. 11 U.S.C. § 544(a)(1), (2), (3). A lien on rents not perfected pre-petition would not be good against any of the three.

As both courts viewed the issue, it was whether a creditor which had failed to perfect its security interest in rents pre-petition by securing the appointment of a re-

---

**3.** Section 546(b) reads:

(b) The rights and powers of a trustee under sections 544, 545, and 549 of this title are subject to any generally applicable law that permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of such perfection. If such law requires seizure of such property or commencement of an action to accomplish such perfection, and such property has not been seized or such action has

not been commenced before the date of the filing of the petition, such interest in such property shall be perfected by notice within the time fixed by such law for such seizure or commencement.

**4.** 11 U.S.C. § 1107 provides that a debtor-in-possession, subject to certain limitations, has all of the rights, powers, and duties of a Chapter 11 trustee.

ceiver could, by filing a notice of sequestration in the bankruptcy court or otherwise invoking Section 546(b), prevent the debtor-in-possession from being able under Section 544 to "void" its security interest in rents, that is claim the rents, despite the creditor's security interest. Citing the legislative history of Section 546, Judge Buschman in *Kearney* held that the post-petition perfection sanctioned by Section 546(b) could aid the creditor only if local law permitted the act of perfection to relate back to a period prior to the filing of the bankruptcy petition. *Vienna Park* also read the Code as limiting "the applicability of § 546(b) to situations where the state law would relate the post-petition act of perfection to a time pre-petition." 120 B.R. at 338. Both cases turn on the reach given 11 U.S.C. § 546(b).

*Kearney* has been criticized for giving insufficient attention to the changes made in the law of bankruptcy by the Code. *In re Tucson Indus. Partners*, 129 B.R. 614, 621–623 (Bankr. 9th Cir.1991). To put that criticism into context, some review of pre-Code law and of the statutory changes made by the Code is helpful.

The critical pre-Code case is *Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). In that case the Supreme Court resolved a conflict in the circuits regarding the interplay of "federal statutes governing the administration of bankrupt estates" and state law. Addressing the competing claims of the debtor and the mortgagee to rents between the time of a mortgagor's bankruptcy and the foreclosure sale of the mortgaged property, the Courts of Appeals had applied different principles. Five Courts of Appeals had resolved the issue by reference to state law. In most states, that meant that the mortgagee's right to rents was dependent upon his having taken actual, or constructive, possession of the property pre-petition by foreclosure, by the appointment of a receiver or by similar legal proceeding. But two Courts of Appeals had adopted a federal rule of equity in the interest of avoiding injustice to the mortgagee that recognized a mortgagee's security interest in rents in the bankruptcy court where the intervention of bankruptcy had prevented the mortgagee from taking the type of action required by state law to establish the mortgagee's right to rents.

The Supreme Court aligned itself with the majority rejecting any federal rule, saying:

> Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding ... The justifications for application of state law are not limited to ownership interests; they apply with equal force to security interests, including the interest of a mortgagee in rents earned by mortgaged property.

*Butner*, 440 U.S. at 55, 99 S.Ct. at 918.

The Court noted that the constitutional authority of Congress under the bankruptcy clause would "clearly encompass a federal statute defining the mortgagee's interest in the rents and profits earned by property in a bankrupt estate," but it went on to point out that the Bankruptcy Act contained no such rule. *Id.* at 54, 99 S.Ct. at 917.

Responding to the concern of the minority of the Courts of Appeals that bankruptcy might impair or delay the mortgagee's exercise of his right to foreclosure and thus his acquisition of a security interest in rents, the Court said, "a bankruptcy judge familiar with local practice should be able to avoid this potential loss by sequestering rents or authorizing immediate state-law foreclosures." *Id.* at 57, 99 S.Ct. at 919. The Court expressly refrained from deciding whether a request to the bankruptcy judge for sequestration of rents, for the appointment of a receiver or for permission to proceed with a state court foreclosure would have satisfied the state law requirements for entitling the mortgagee to rents, leaving it to the lower courts to determine how the state courts would decide these issues.

The Code is not the same bankruptcy statute as the one before the Court in

*Butner.* The Code has not changed the principle that the nature of the security interest is to be determined under state law, but it has broadened the protection given a security interest, once bankruptcy intervenes.

New to the Code is the concept of cash collateral. 11 U.S.C. § 363. Cash collateral is defined as cash in which the estate and an entity other than the estate have an interest. 11 U.S.C. § 363(a). It embraces the idea of something less than unqualified ownership. Cash collateral includes "proceeds, products, offspring, rents, or profits of property subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title." *Id.* The Code prohibits the use of cash collateral unless either consented to by each entity that has an interest in such collateral or authorized by the court. 11 U.S.C. § 363(c)(2) It also requires the trustee (or debtor-in-possession) to segregate and account for any cash collateral that it does not have the consent of the creditor or authority from the court to use, sell or lease. 11 U.S.C. § 363(c)(4).

At any time, on request of an entity that has an interest in property which the debtor-in-possession proposes to use, sell or lease, the court shall prohibit or condition such use, sale or lease as is necessary to provide such interest with adequate protection. 11 U.S.C. § 363(e).

The Code also defines "lien" broadly to include inchoate liens. H.R.Rep. No. 595, 95th Cong., 1st Sess. 312 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 6269. A "lien" is defined as a "charge against or interest in property to secure payment of a debt or performance of an obligation." 11 U.S.C. § 101(33). Therefore, even if a lien for rent is inchoate because no action has been taken pre-petition to obtain possession, it still qualifies as a lien and therefore as a security interest entitled to protection under 11 U.S.C. § 363. *In re Somero*, 122 B.R. 634, 641 (Bankr.D.Me.1991).

The differences between the Bankruptcy Code and its predecessor change the consequences, when a mortgagor files for bankruptcy relief, for a mortgagee with a security interest in rents but who pre-petition has not taken possession or had a receiver of rents appointed. The rents continue to be the property of the debtor, but the mortgagee is not without rights, which the debtor must recognize.

The cash collateral provisions in the Code are given their proper significance in *In re Rancourt*, 123 B.R. 143 (Bankr.D.N.H. 1991). The bankruptcy court held there that despite the fact that the mortgagee, who also held an assignment of leases, had not taken possession of the real property prior to bankruptcy, it held a cash collateral interest in the rentals entitling those rentals to the special protection provided by the Code with regard to that type of collateral. As Bankruptcy Judge Yacos analyzed the governing legal principles, they are: (1) the recording pre-bankruptcy by a mortgagee lender of the mortgage and/or any separate documents assigning leases and rentals, gives the mortgagee a security interest in "rents" as a type of collateral, as opposed to a security interest in specific rent payments; (2) The fact that the mortgagee cannot enforce its interest in specific rents prior to taking over possession and management of the rental premises does not destroy the mortgagee's security interest in rents as a type of collateral held by the mortgagee at the time of the recording of the pertinent documents.

Judge Yacos concludes:

The inevitable conclusion from the foregoing is that the mortgagee's rights with regard to rents as a type of collateral is an "interest" in property within the meaning of § 363(a) of the Bankruptcy Code, and is a "security interest [that] extends to ... rents ... to the extent provided by [the] security agreement and by applicable nonbankruptcy law ..." within the meaning of § 552(b) of the Bankruptcy Code. That being so the rights of the mortgagees in the present cases, with regard to rents relating to the mortgaged properties, are "cash collateral" under the Bankruptcy Code ...

The conclusion set forth in the preceding paragraph is also inescapable since this Court can see no principled way to support a ruling that the mortgagees involved in the present matter have no "cash collateral" security interest in rents, simply because prebankruptcy they did not have any *effectuated* right to *collect* specific rent payments, when no court has held, or would hold, that a secured creditor with a perfected "floating lien" security interest in account receivables and other revolving types of collateral would not be entitled to § 363 cash collateral protection simply because there had been no default or effort to collect specific items of collateral prior to the bankruptcy proceeding.

*In re Rancourt,* 123 B.R. at 148 (Emphasis in original).

Other courts have also recognized rents as cash collateral, even if prior to bankruptcy no steps had been taken by the mortgagee or assignee to enforce its right to rents as required by state law before a mortgagee or assignee had the right to collect such rents. In *In re Tucson Indus. Partners,* 129 B.R. 614 (Bankr. 9th Cir. 1991), the dissent pointed out that under Arizona law, the present right to receive rents required some further affirmative act, which the secured creditor had not taken pre-petition. *Id.,* at 625. Nevertheless, the majority concluded that Section 363 contemplated the automatic sequestration of rents where the secured creditor had perfected its lien on rents by recordation. *See also, In re Miller,* 133 B.R. 882 (Bankr.N.D.Ohio 1991) (the debtor directed to segregate and account for revenues collected after creditor's motion to segregate); *In re Park at Dash Point L.P.,* 121 B.R. 850 (Bankr.W.D.Wash.1990) (unenforced assignment of rents constitutes an interest in rent sufficient to render the rents cash collateral); *In re Foxhill Place Assoc.,* 119 B.R. 708 (Bankr.W.D.Mo. 1990) (the court approved a settlement giving the creditor, which pre-petition had not enforced its security interest, the rents collected after the date of the creditor's motion to segregate).

Taking a somewhat different approach is *In re Coventry Commons Assoc.,* 134 B.R. 606 (Bankr.E.D.Mich.1991). There, the court, deliberately eschewing any determination as to whether or not rents are "cash collateral" where the secured creditor did not have a presently enforceable interest in receiving rents, but only an inchoate interest, holds the secured creditor's interest in the receipt of future rents to be entitled to adequate protection.

Of course, when state law does not require appointment of a receiver or other similar action to perfect the secured creditor's right to rents, such rents constitute cash collateral. *In re Somero,* 122 B.R. 634, 640 (Bankr.D.Me.1991) (under Maine law an interest in rents and property was perfected by recording and appointment of a receiver was not necessary, therefore, post-petition rents were cash collateral under Section 363); *In re Greenhaven Village Apartments Phase II Ltd. Partnership,* 100 B.R. 465, 471 (Bankr.D.Minn. 1989) (under Minnesota law, recorded assignment of rents cannot be avoided by debtor-in-possession and rents are, therefore, cash collateral).

The importance the parties in this case assign to 11 U.S.C. § 546(b) stems from the fact that they treat the right to rents as absolute belonging either to the Debtor or Citibank. Under their analysis, unless Citibank can establish a right to the rents superior to that of the Debtor, it cannot interfere with how the Debtor uses them. That view is consistent with the vocabulary of *Kearney* which talks of avoiding the creditor's liens. But the Debtor cannot void Citibank's lien under 11 U.S.C. § 544 in the sense of wiping that lien out. At best, Section 544 in this context establishes priorities. The right of Northport to the rents is superior to Citibank's but in whatever use Northport makes of the rents it is subject to the restrictions the Code imposes on the use of cash collateral. Once rents are deemed a type of cash collateral subject to the restrictions imposed on such property, regardless of whether the mortgagee had taken possession of them pre-petition by appointment of a receiver or other legal action, it becomes irrelevant whether Sec-

tion 546(b) permits a relation-back pre-petition. This was recognized by Judge Yacos, who dubbed 11 U.S.C. § 546(b) in a similar context "a very large 'red herring' ". *In re Rancourt*, 123 B.R. 143, 146 (Bankr.D.N.H. 1991).

Viewing rents as cash collateral in which a secured creditor has an interest even though the debtor's title is superior is more compatible with the overall structure of the Code than the result reached in *Kearney*, which would deny a secured creditor any protection of its interest. Just as an absolute assignment of rents does not leave the debtor without any interest, *cf., In re Grant Assoc.*, No. M–47 (RJW), 1991 WL 21228 (S.D.N.Y. Feb. 5, 1991), so equally should the creditor not be denied all rights because no steps were taken pre-petition to enforce its security interest.

Some questions still remain, however. Is a debtor restricted in its use of rents from the time it files or only from the time the secured creditor moves to assert its rights? Can the rents be used to preserve and maintain the underlying real property, or must they be sequestered for the mortgagee? The precedents provide no clear answers.

In *In re Tucson Indus. Partners*, 129 B.R. 614 (Bankr. 9th Cir.1991), the court split on these issues. The majority held that from the date the bankruptcy was filed, the rents were cash collateral which a debtor could not use without moving for such use and demonstrating that the secured creditor was adequately protected. The dissenting judge would have limited the secured creditor to the period following its objection to the use of cash collateral and its motion for adequate protection.

Disposition of the motion now before the Court does not require resolution of these issues which the parties have had no opportunity to brief and on which they may well compromise since use of the rents to maintain the property is in the best interest of both. *See, In re Coventry Commons Assoc.*, 134 B.R. 606 (Bankr.E.D.Mich.1991). The sole issue presented by the Debtor's cross-motion is whether or not Citibank has any rights whatsoever in Northport's post-petition rentals. The answer to that question is that Citibank does. The Court's conclusion that Citibank has cash collateral rights in post-petition rents under Sections 363 and 552 of the Bankruptcy Code is dispositive of the Debtor's motion.

For the foregoing reasons, the Debtor's cross-motion is denied.

Settle Order.